**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 10 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GREGORY F. FLOYD and DENISE
D. FLOYD, doing business as Medical
Information Services; HAROLD
DEAKINS and LYNNE DEAKINS,
doing business as K and L Computers;
RHONDA SIPPEL, doing business as
Statbilling; JERRY NEVONEN, doing
business as Network Facilities;
WILLIAM MUTH, doing business as
Electronic Billing Services; JACKIE
RAY, doing business as Medical
Billing Service; THOMAS PERRY,
doing business as TurboClaim,

     Plaintiffs - Appellants,

v.

INTERNAL REVENUE SERVICE of
the United States of America; STATE
OF KANSAS ex rel. Carla Stovall,
Attorney General; 12424 ABERDEEN,
JOHNSON COUNTY, KANSAS, a
certain piece of real estate,

     Defendants - Appellees.

No. 96-3166

---

GREGORY F. FLOYD, DENISE D. FLOYD, doing business as Medical Information Services; HAROLD DEAKINS, LYNNE DEAKINS, doing business as K and L Computers; RHONDA SIPPEL, doing business as Statbilling; JERRY NEVONEN, doing business as Network Facilities; WILLIAM MUTH, doing business as Electronic Billing Services; JACKIE RAY, doing business as Medical Billing Service; THOMAS PERRY, doing business as TurboClaim,

     Plaintiffs - Appellees,
and

INTERNAL REVENUE SERVICE of the United States of America,

     Defendant - Appellee,

v.

STATE OF KANSAS ex rel. Carla Stovall, Attorney General,

     Defendant - Appellant,

and

12424 ABERDEEN, JOHNSON COUNTY, KANSAS, a certain piece of real estate,

     Defendant.

No. 96-3215

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-2177-JWL and 95-CV-2177)**

---

Edward A. McConwell (Laura L. McConwell with him on the brief), McConwell Law Offices, Overland Park, KS, for Gregory F. and Denis D. Floyd, Harold and Lynne Deakins, Rhonda Sippel, Jerry Nevonen, William Muth, Jackie Ray and Thomas Perry.

Martin J. Peck, Special Assistant Attorney General, Wellington, KS, for the State of Kansas.

Theodore M. Doolittle (Kenneth L. Greene with him on the briefs), Department of Justice, Washington, D.C., for the Internal Revenue Service.

---

Before **HENRY**, and **LUCERO**, Circuit Judges, and **MILES-LaGRANGE**, District Judge.[*]

---

**LUCERO**, Circuit Judge.

---

Thomas Bridges and his associated companies are in debt to three parties: the Internal Revenue Service ("IRS"), the State of Kansas, and a group of private judgment-creditors, the "Floyd plaintiffs." These three parties sought judicial resolution of the priority of their claims to the assets of Bridges and his companies. Following a bench trial, the District Court for the District of Kansas held that the IRS claims primed those of the other two parties, and that, as to the

---

[*] The Honorable Vicki Miles-LaGrange, United States District Judge for the Western District of Oklahoma, sitting by designation.

remaining assets, Kansas took priority over the Floyd plaintiffs. The district court's holding was premised in part on the IRS's position that one of Bridges's companies was his alter ego. Because we find that the district court erred in accepting the IRS's alter ego argument, we reverse and remand.

**I**

In 1991, Thomas Bridges founded two corporations, Network Billing Centers, Inc. ("NBC") and Med-Net Technologies, Inc. ("Med-Net"), both in the business of licensing and developing computer software. Bridges, who was the sole shareholder and director of these companies, had complete control over them. Bridges's salary from NBC was paid into the account of Thomas Marketing, Inc. ("TMI"), another corporation founded and controlled by him and of which he was the sole shareholder and director.

The IRS's claims against Bridges and his associated companies date from Bridges's failure to pay personal income tax in 1984. The IRS first filed a Notice of Federal Tax lien against Bridges in 1990. In 1993, the IRS filed additional tax liens against Bridges as a result of his failure to pay personal income tax between 1988 and 1991. The following year, the IRS filed two tax liens against Med-Net for failing to pay employment taxes for the second and third quarters of 1993. Kansas's claims are based on a pre-judgment attachment of Med-Net, NBC, and TMI accounts following the filing of an action by the State against Bridges, Med-

Net, and NBC under the Kansas Consumer Protection Act ("KCPA"). Kansas won this action in late March 1994, obtaining judgment for just under $1 million. The Floyd plaintiffs' claim is based on their successful suit against Bridges, NBC, and Med-Net for fraud and breach of contract. They secured judgment in early March 1994.

These three creditors dispute their priority to two groups of assets: first, some $179,000, which constitutes proceeds from the sale of a house in Lenexa, Kansas, held in the registry of the United States District Court for the District of Kansas pursuant to a settlement between the three creditors; second, some $84,000 from the Med-Net, NBC, and TMI accounts attached by Kansas, which is held in the registry of the District Court of Johnson County.[1]

The Lenexa house was purchased using primarily Med-Net funds in 1992. Bridges's daughter, Brooke Bridges McBride, filed an affidavit of equitable interest in the property with the register of deeds in Johnson County; legal title was apparently to pass from the construction company to McBride pursuant upon

---

[1] The total amount seized was approximately $155,000. This sum was reduced pursuant to an agreement in August 1994 between the Floyd plaintiffs and the State to around $84,000.

full payment under a contract for deed.[2]  Both Bridges and McBride lived in the house.

In April 1994, after obtaining judgment against Bridges, Med-Net, and NBC under the KCPA, Kansas filed another state court action, which was subsequently joined by the Floyd plaintiffs, alleging that McBride had received the house through a fraudulent conveyance from Med-Net and NBC.  Shortly thereafter, the Floyd plaintiffs unsuccessfully attempted to collect on their judgment against Bridges, Med-Net, and NBC by garnishing McBride, arguing that Med-Net held its interest in her name.  To resolve their claims to the house, Kansas, McBride, and the Floyd plaintiffs entered into a settlement whereby the house was to be sold, with the bulk of the proceeds to be contested among the competing creditors.  After filing a lien against the house naming McBride as Bridges's nominee, the IRS subsequently joined this settlement, and the house was sold.

## II

The district court accepted the IRS's arguments that Med-Net was Bridges's alter ego and that McBride held the house as Bridges's nominee.  With

---

[2]  The handwritten version of this contract listed Bridges and McBride as purchasers.  A typed version prepared the same day lists only McBride.  The district court determined Bridges had his name removed because he did not want the IRS to put a lien on the house.

one exception, therefore, the federal tax liens had been filed against Bridges and Med-Net before either of the other creditors had secured their judgments against Bridges and his associated companies.[3]  Consequently, acting on the principle that "priority for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right,'" United States v. McDermott, 507 U.S. 447, 449 (1993) (quoting United States v. New Britain, 347 U.S. 81, 85 (1954)), the district court held that the IRS's claims to the house proceeds primed the claims of both Kansas and the Floyd plaintiffs.  Because the IRS's claims, which amounted to some $186,000, exhausted the sale proceeds entirely, the district court did not determine the relative priority of the other two creditors' claims to the house.

The district court further held that the remaining $7,000 still owing to the IRS should be satisfied from the seized bank accounts, of which it concluded some $136,000 was traceable to Bridges and his alter ego Med-Net.  As to the remaining bank account funds, the district court found that the State perfected its attachment lien when it won a favorable judgment in its KCPA suit.  Because the State perfected its interest in the funds before the Floyd plaintiffs executed their

---

[3]  The exception is the federal tax lien filed against Med-Net for its failure to pay employment taxes for the third quarter of 1993.  The IRS does not appeal the district court's holding that both Kansas and the Floyd plaintiffs' claims have priority over this claim.

judgment liens against those same funds, the district court concluded that Kansas had priority over the Floyd plaintiffs to whatever funds remained. Kansas and the Floyd plaintiffs both appeal.

### III

Federal tax liens only arise in property as to which the defaulting taxpayer has rights of ownership. See United States v. Wingfield, 822 F.2d 1466, 1472 (10th Cir. 1987). State law determines such rights. See United States v. Central Bank of Denver, 843 F.2d 1300, 1303-04 (10th Cir. 1988). Federal law then determines the priority of competing liens against a taxpayer's property. See Aquilino v. United States, 363 U.S. 509, 514 (1960).

Both Kansas and the Floyd plaintiffs argue that Bridges had no rights to the Lenexa house, thus placing that property beyond the reach of the tax liens filed by the IRS against Bridges. More specifically, the Floyd plaintiffs argue that the house was properly owned by Med-Net, and because Med-Net was not Bridges's alter ego, the house is properly claimable only by Med-Net creditors. Kansas, for its part, argues that Bridges fraudulently conveyed the house to McBride, leaving him without a valid claim to the property under state law.

The district court determined that Med-Net was the alter ego of Bridges based on Pemco, Inc. v. Kansas Dep't of Revenue, 907 P.2d 863 (Kan. 1995). If we accepted Pemco as the controlling authority in this case, we would review that

determination deferentially.  See G.M. Leasing Corp. v. United States, 514 F.2d 935, 939 (10th Cir. 1975) (district court's finding of alter ego status "presumptively correct and must be left undisturbed on appeal unless . . . clearly erroneous"), rev'd in part on other grounds, 429 U.S. 338 (1977).  And were we to do so, we would conclude that the evidence before the district court manifestly supported its conclusion that the "relationship" between Bridges and Med-Net was "so intimate," Bridges's "control" over Med-Net "so dominating," and "the business and assets of the two are so mingled that recognition of [Med-Net] as a distinct entity would result in an injustice to third parties." Pemco, 907 P.2d at 867 (quoting Doughty v. CSX Transp., Inc., 905 P.2d 106, 111 (Kan. 1995)).  We also would not find error in the district court's conclusion that crediting Med-Net with a separate corporate identity would sanction Bridges's unjust evasion of his federal tax liability.

But Pemco does not appropriately govern this case.  The Pemco court considered a parent company's request to be treated as a single unit with its corporate subsidiary for sales tax purposes.  Ultimately, the court refused that request because "a corporation, having chosen the legal form in which to exist and do business, should not be permitted to pierce its own corporate veil to gain a tax advantage." Id. at 866.  That rule does not speak to the case of an outside entity—here, the IRS—seeking to pierce the corporate veil.

True, Pemco does recite Kansas's "substantial case law authorizing the piercing of a corporate veil if to do otherwise would work an injustice on third parties." Id. at 867. Those precedents, however, are inapplicable here because they consider the "standard" veil-piercing situation, in which corporate creditors seek to disregard the corporate form in order to hold stockholder assets liable for the corporation's debts. In this case, we are presented with the reverse phenomenon because the IRS seeks to pierce Med-Net's veil and use corporate assets to satisfy the obligations of an individual stockholder. Cf. Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1390 (9th Cir. 1993) ("Ordinarily, courts are called upon to apply the alter ego doctrine in cases where a party seeks to hold an individual liable for a business entity's debts."); Cascade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1575 (10th Cir. 1990) (stating that reverse-piercing theory employed by district court "led to the peculiar result of holding the corporation liable for the debts or torts of its controlling shareholder rather than the other way around") (emphasis added). The IRS's claims, in which an outside party seeks to meld the stockholder and the corporation into one, represent a "variant" on the usual "reverse-piercing" claim, in which an insider asserts that theory. See Cascade, 896 F.2d at 1575 n.17; see also Gregory S. Crespi, The Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J. Corp. L. 33, 37-

38 (1991) ("Crespi") (distinguishing between inside and outside reverse-piercing claims).

The Floyd plaintiffs urge us to reject this outside reverse veil-piercing theory, at least where third-party corporate creditors would thereby be harmed. The government counters that numerous cases recognize such a practice in the federal taxation context. See No. 96-3166, IRS's Br. at 30 (citing, e.g., Towe, 999 F.2d at 1390-91). But the question of whether Med-Net can be found to be Bridges's alter ego for purposes of reverse veil-piercing must be answered by state law, see Towe, 999 F.2d at 1391; Terrapin Leasing, Ltd. v. United States, No. 79-1086, 1981 WL 15490, at *2 (10th Cir. Apr. 6, 1981), and none of the authorities cited by the government are drawn from that body of jurisprudence. Nor does the taxation context of the government's claim dictate the outcome here. "The IRS should be viewed as any other creditor seeking to pierce a corporate veil that is allegedly defrauding it of its legitimate claim." Terrapin, 1981 WL 15490, at *2.

In fact, there are significant reasons to resist application of the alter ego doctrine in this case. The IRS has presented no authority suggesting that Kansas does or would recognize an outside reverse-piercing claim, and our own review of Kansas law provides no authoritative support for that proposition. See Cascade, 896 F.2d at 1577 (holding that, "[a]bsent a clear statement" by state supreme

court adopting outside reverse-piercing theory, federal court will not reverse pierce). [4]

In addition, "[t]he reverse-pierce theory presents many problems." Id. In Cascade , we noted two. First, the theory "bypasses normal judgment-collection procedures whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." Id. Second, third parties may be unfairly prejudiced if the corporation's assets can be attached directly. Although in Cascade our particular concern was with non-culpable third-party shareholders of the corporation being unfairly prejudiced, no greater culpability should attach to the third-party corporate creditors harmed by reverse-piercing in this case. See id. ("'[A] necessary element of the [alter ego] theory is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct

---

[4] The Kansas courts did once apply a variant of reverse piercing—but only in a jurisdictional context. In Farha v. Signal Cos., 532 P.2d 1330, modified, 535 P.2d 463 (Kan. 1975), the Supreme Court of Kansas upheld a finding of personal jurisdiction against a corporation, which was not otherwise reachable under the Kansas long-arm statute, on the grounds that its co-defendant parent corporation transacted business within the state. While that decision contains alter ego and veil-piercing language, it does not contain any indication whatsoever that the subsidiary's assets were reachable as a result of the parent's substantive liability. As in personam jurisdiction can be asserted whenever a defendant has those "minimum contacts" with the forum state that will satisfy "'traditional notions of fair play and substantial justice,'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)), the Farha decision is best understood as limited to the jurisdictional context; these jurisdictional standards should not be presumed to translate into substantive corporate law.

constituting the abuse of corporate privilege— <u>the doctrine cannot be applied to prejudice the rights of an innocent third party</u>.'") (quoting 1 William Meade Fletcher et al., <u>Fletcher Cyclopedia of the Law of Private Corporations</u> § 41.20, at 413 (1988 Supp.)) (emphasis added); <u>see also</u> <u>Hamilton v. Hamilton Properties Corp.</u>, 186 B.R. 991, 1000 (Bankr. D. Col. 1995) ("The reverse piercing theory is an aberration which, if invoked, would prejudice . . . the rightful creditors of the corporation whose assets are subsumed for the benefit of the creditors of the individual. What of the creditors of [the corporation] who relied on its separate corporate existence in doing business with it?"); <u>Cargill, Inc. v. Hedge</u>, 375 N.W.2d 477, 479 (Minn. 1985) (holding that in considering propriety of reverse pierce, "[a]lso important is whether others, such as a creditor or other shareholders, would be harmed by a pierce").

There are reasons beyond those identified in <u>Cascade</u> to deny an alter ego claim of this kind. For one thing, the prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured—expressly or otherwise—by corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reverse-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit. Furthermore, as Judge Learned Hand suggested in what may be the earliest case to

consider such a claim, outside reverse piercing is only appropriate in the rare case of a subsidiary dominating its parent. See Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929); see also Crespi at 67 ("Kingston stands for the proposition that the highly unusual circumstance of a subsidiary dominating its parent is a virtual prerequisite for finding the kind of unity that would allow an outside[] reverse pierce . . . ."); id. at 57, 65-66. Here, the premise of the IRS's position is that the effective subsidiary—Med-Net—was the dominated party, which makes it hard, if not impossible, to argue for forfeiture of its assets through a reverse pierce. Additionally, disregard of the corporate form is an equitable remedy. See McKinney v. Gannett Co., 817 F.2d 659, 666 (10th Cir. 1987). As a consequence, it is appropriately granted only in the absence of adequate remedies at law. See 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 41.25, at 653 (perm. ed. rev. vol. 1990). In cases where a corporation has been dominated by a controlling stockholder, an agency or aiding and abetting theory may suffice to hold the corporation liable for the actions of that stockholder. See Crespi at 65. Standard judgment collection procedures may also suffice to cover shareholder liability without expanding equitable theories of corporate liability. See Cascade, 896 F.2d at 1577. And, in taxation cases, the transfer of an economic benefit to a shareholder may be reachable for tax purposes as a constructive dividend, again

- 14 -

obviating the need for the more drastic remedy of corporate disregard.      See

generally 10 Jacob Mertens, Jr. et al.,     The Law of Federal Income Taxation     §

38B.33 (1991).

We recognize that the problems associated with reverse-piercing may be

viewed as less serious in cases where a corporation is controlled by a single

shareholder—there are, for instance, no third-party shareholders to be unfairly

prejudiced by disregarding the corporate form.  Should the Kansas courts consider

adopting the doctrine of reverse-piercing, that factor may well influence the terms

of any rule they ultimately adopt.  Consequently, we stress that in reciting the

litany of problems associated with the doctrine, we should not be understood as

seeking to dictate or influence the law of corporations in Kansas.  Rather, we seek

only to lend additional weight to     Cascade 's federal law conclusion that, in the

absence of a clear statement of Kansas law by the Kansas courts, we will not

assume that such a potentially problematic doctrine already has application in that

state.  See Cascade , 896 F.2d at 1577.

**IV**

The lion's share of the district court's analysis of this complex litigation is

premised on its finding that Med-Net was Bridges's alter ego.  The district court's

conclusion that McBride held title to the house as Bridges's nominee depends on

its underlying finding that Bridges purchased the house through his alter ego

- 15 -

Med-Net. Similarly, the determination of priority to the bank account proceeds assumes that the IRS satisfies the bulk of its claims by means of the proceeds from the sale of the house. If that latter determination is undone, then the IRS's claims to the bank account funds, or the resolution of the other parties' claims to the house proceeds, may impact the district court's determination that Kansas would receive the bulk of the bank account funds.

However, the district court's opinion need not inexorably unravel with our holding here because the IRS also brought a constructive dividend claim. That claim, if adjudged successful, might lead to the same conclusion as to the ownership of the house and the court's subsequent determinations flowing therefrom. The district court did not rule as to whether Med-Net's purchase of the house was a constructive dividend to Bridges. As the record on appeal contains no indication that the facts relevant to a constructive dividend determination are undisputed, we cannot decide this question as a matter of law, and it must instead be resolved in the first instance by the trial court below. Cf. Dolese v. United States, 605 F.2d 1146, 1153 (10th Cir. 1979). We are therefore obliged to remand for further proceedings.

**REVERSED** and **REMANDED** for further proceedings consonant with the views herein expressed.