[No. G038270. Fourth Dist., Div. Three. May 20, 2008.]

POSTAL INSTANT PRESS, INC., Plaintiff and Respondent, v. KASWA CORPORATION, Defendant and Appellant.

**COUNSEL**

Palumbo Bergstrom and David B. Wasson for Defendant and Appellant.

Berry & Perkins and Kenneth L. Perkins, Jr., for Plaintiff and Respondent.

**OPINION**

**FYBEL, J.—**

INTRODUCTION

Kaswa Corporation (Kaswa) appeals from an amended judgment entered after the trial court granted the motion of Postal Instant Press, Inc. (PIP), to add Kaswa as a defendant/judgment debtor. PIP had obtained the judgment against Shahid Rangoonwala, a former shareholder of Kaswa, for claims arising out of a franchise agreement to which Kaswa was not a party. In this case of first impression in California, we analyze authorities nationwide and hold a third party creditor may not pierce the corporate veil to reach

corporate assets to satisfy a shareholder's personal liability. Accordingly, we reverse.

 Under the standard alter ego doctrine, in appropriate circumstances the corporate form may be disregarded and the corporate veil pierced so that an individual shareholder may be held personally liable for claims against the corporation. Some courts have recognized a variant of the alter ego doctrine, called third party or "outside" reverse piercing of the corporate veil, by which the corporate veil is pierced to permit a third party creditor to reach corporate assets to satisfy claims against an individual shareholder.

The reasoning of the cases adopting outside reverse piercing of the corporate veil is flawed, and we join other courts declining to accept it. As we will explain, outside reverse piercing is not a logical extension of the standard alter ego doctrine but instead addresses significantly different concerns. Outside reverse piercing can harm innocent shareholders and corporate creditors, and allow judgment creditors to bypass normal judgment collection procedures. Legal theories (such as agency or respondeat superior) and legal remedies (such as claims for conversion or fraudulent conveyance) adequately protect judgment creditors without the need to distort theories of corporate liability.

To address the many concerns created by outside reverse piercing, the courts recognizing the doctrine have created significant qualifications to its application. These qualifications swallow the rule in practice. PIP failed to satisfy at least two of those qualifications—inadequacy of legal remedies and no harm to innocent creditors—and, as a result, we would reverse even if we accepted the doctrine of outside reverse piercing.

FACTS

In 1998, Rangoonwala and Syed Saeed Ahmed purchased a PIP franchise from the franchisee. On July 24, 1998, Rangoonwala and Ahmed executed an agreement and consent to assignment of the franchise. PIP was a party to this assignment agreement and consented to the assignment of the franchise to Rangoonwala and Ahmed. Rangoonwala and Ahmed assumed the written contract (the Franchise Agreement) dated July 13, 1983, governing the relationship with PIP and held the PIP franchise as general partners. In May 1998, Rangoonwala and Ahmed formed Kaswa as a corporation and initially capitalized it with $40,000. Kaswa was not a party to the Franchise Agreement or the assignment agreement.

Sometime in 2000, Ahmed left the partnership that held the PIP franchise and sold his equity interest in it to Rangoonwala for $10,000. However, in October 2001, Rangoonwala signed an "Ownership Structure Addendum" verifying both he and Ahmed owned the franchise as a general partnership, with each having a 50 percent equity interest in the franchise.

In late September or early October 2001, after Ahmed had left the partnership, Rangoonwala asked PIP's director of credit and collections, Edward Longo, if Kaswa could replace Rangoonwala as the franchisee on the Franchise Agreement. Longo refused. In a letter to Rangoonwala, dated October 9, 2001, Longo stated, "[a]s soon as your new Articles of Incorporation are completed, please forward a copy to our Legal department and they will make the necessary revisions to the [franchise] agreement." On October 24, 2001, Rangoonwala, individually as the franchisee, signed an amendment to the Franchise Agreement.

In 2003, PIP filed a UCC-1 financing statement to perfect a security interest in certain property owned by Rangoonwala, including machinery, equipment, and trade fixtures.

In September 2004, a dispute arose between PIP and Rangoonwala concerning payment of royalties by Rangoonwala to PIP under the Franchise Agreement. PIP and Rangoonwala submitted the dispute to arbitration, as required by the Franchise Agreement. In February 2005, the arbitrator issued an award of $77,434.69 in PIP's favor and against Rangoonwala. In June 2005, the trial court granted PIP's petition to confirm the arbitration award, and judgment was entered against Rangoonwala in the amount of $79,810.21, with postjudgment interest at the rate of 10 percent per year. On the date judgment was entered, the PIP franchise was owned solely by Rangoonwala.

As part of its judgment collection efforts, PIP hired a private investigator to investigate Rangoonwala's background and finances. During the course of the investigation, PIP learned Rangoonwala had a new partner named Michael Haxton and the two had sold all of the franchise assets to a company called Definite Impressions, a sole proprietorship owned by Ward Johnson. PIP served Johnson with a notice of levy on money, credit or debts belonging or owing to Rangoonwala. PIP also conducted an Internet-based public records search on Rangoonwala.

PIP conducted a judgment debtor's examination of Rangoonwala in February 2006. Rangoonwala testified at the judgment debtor's examination that Kaswa had been formed for the purpose of operating the PIP franchise and

that Kaswa owned the franchise assets. In 2002, after Ahmed had left the business, Kaswa merged with a company called The Print Works, which was owned by Haxton. The resulting company, which retained the name Kaswa, continued to operate the PIP franchise. According to Rangoonwala, he no longer owned shares of Kaswa, having "walk[ed] away" to "put everything behind me." He did continue, however, to receive monthly draws of $2,600 from the PIP franchise through August 31, 2005.

Soon after entry of the judgment against Rangoonwala, Kaswa sold the franchise assets to Ward Johnson and Susan Johnson (the Johnsons), doing business as Definite Impressions. According to Rangoonwala, Ward Johnson "basically came in and emptied out . . . whatever was there basically in the business . . . he took. . . . I just didn't want anything to do with it."

Rangoonwala testified PIP knew about Kaswa because in 2001 he had asked PIP to allow him to substitute Kaswa as the franchisee. According to Rangoonwala, PIP declined, but told him he could add Kaswa as an additional franchisee. Rangoonwala was not interested in merely adding Kaswa to the Franchise Agreement because in that case he would remain personally liable under the Franchise Agreement. In a declaration submitted in opposition to the motion to add Kaswa as a judgment debtor, Rangoonwala stated he was not opposed to adding Kaswa to the Franchise Agreement, but PIP did not pursue the matter.

In July 2006, PIP conducted a judgment debtor's examination of Haxton, who testified he was the sole shareholder and president of Kaswa. Haxton testified that Rangoonwala had been the secretary and possibly a vice-president of Kaswa, as well as a shareholder, but had walked away from Kaswa several years earlier while owing the company $9,500 for draws on his equity. Haxton testified that Kaswa sold its assets in August 2005 to the Johnsons, doing business as Definite Impressions, for a price of $300,000 and produced a copy of the written sale agreement. The agreement, dated August 29, 2005, called for a downpayment of $50,000 and installment payments for the balance over the next 31 months.

In a declaration submitted in opposition to PIP's motion to amend the judgment to add Kaswa as a judgment debtor, Haxton stated he purchased Ahmed's interest in Kaswa for $20,000; since 2002, Rangoonwala's personal assets were not commingled with Kaswa's; Kaswa and The Print Works merged in 2002; after the merger, Haxton exercised control over Kaswa; and Rangoonwala continued to operate the PIP franchise, but did not participate in Kaswa's operation. According to Haxton's declaration, "[o]ther than some minor equipment purchased by Mr. Rangoonwala and a list of customers

Mr. Rangoonwala had acquired, K[aswa] contributed nothing significant to the merger and the new business except its name."

The Johnsons made the downpayment and five installment payments to Kaswa. They stopped making payments sometime after January 2006, when they learned of the judgment against Rangoonwala. The Johnsons believed the judgment constituted a breach of the agreement to purchase Kaswa's assets.

As of July 2006, Haxton was the only shareholder of Kaswa. Its only asset was the right to receive about $225,000 from the Johnsons under the agreement to purchase Kaswa's assets. Kaswa conducted no business, did not maintain corporate records, and did not conduct shareholder meetings.

### MOTION TO ADD JUDGMENT DEBTOR

In October 2006, after taking the judgment debtor examinations, PIP moved pursuant to Code of Civil Procedure section 187 to amend the judgment to add Kaswa as a judgment debtor. On December 19, 2006, the trial court heard oral argument, and, after addressing Kaswa's evidentiary objections, took the matter under submission.[1]

On January 17, 2007, the trial court issued an order granting PIP's motion, concluding Rangoonwala and Kaswa were alter egos of each other. The court explained: "Rangoonwala claims that he was no longer participating in Kaswa at the time the underlying litigati[o]n commenced. However, as Kaswa owned all of the printing equipment and Rangoonwala was still a shareholder, this claim rings hollow. Also, Rangoonwala stated that the initial $40,000 was used to purchase the Franchise, for working capital, and to 'survive off of['] . . . . This shows that the capitalization of the company was inadequate and that Kaswa's money was used to purchase the Franchise—a franchise that was supposed to have been owned and operated by Rangoonwala and Ahmed. This also shows that the corporate assets were freely commingled with shareholder assets. [¶] The sole purpose in creating Kaswa was to operate the

---

[1] Kaswa objected to portions of a declaration and some attached exhibits submitted in support of PIP's motion. PIP did not respond to the objections because, as its counsel stated at the hearing on the motion, the evidence to which Kaswa objected was not dispositive of the motion. The trial court did not formally rule on the objections, but stated: "I was going to let [counsel] argue [the objections], but then [PIP's] counsel said he doesn't have any argument with these, he's going to concede these." On appeal, PIP does not argue the merit of Kaswa's evidentiary objections, and this opinion excludes reference to any fact based on evidence that was the subject of those objections.

Postal Instant Press, Inc[.] franchise . . . . Therefore, by appearing in the underlying litigation, in which Postal Instant Press, Inc[.] was seeking royalty fees and advertising fund fees under the Franchise Agreement, Rangoonwala was essentially defending both himself and Kaswa against Postal Instant Press, Inc[.]'s allegations. Kaswa's claim that it would have asserted defenses in the arbitration is pure 20-20 hindsight and speculation with no factual basis."

An amended judgment adding Kaswa as a judgment debtor was entered on February 2, 2007. Kaswa timely appealed from the amended judgment.

## Discussion

■ Code of Civil Procedure section 187 authorizes a trial court to amend a judgment to add judgment debtors. (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554 [49 Cal.Rptr.2d 286].) Kaswa argues the trial court erred by adding it as a judgment debtor because the alter ego doctrine may be used only to pierce the corporate veil to hold corporate officers and shareholders liable for the corporation's debts and may not be used, as it was here, to hold the corporation liable for the debts of a shareholder. PIP counters by arguing the alter ego doctrine may be used in either direction—to reach shareholder assets to satisfy corporate debts, or to reach corporate assets to satisfy shareholder debts.

Neither here nor in the trial court did Kaswa or PIP cite the breadth of authorities we discuss in this opinion; indeed, neither one has cited a single case accepting or rejecting the doctrine of outside reverse piercing of the corporate veil. Our independent research and analysis lead us to reject outside reverse piercing.

■ Government Code section 68081 has been satisfied because PIP knew of the outside reverse piercing issue and had full opportunity to brief it. "Section 68081 does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so." (*People v. Alice* (2007) 41 Cal.4th 668, 677 [61 Cal.Rptr.3d 648, 161 P.3d 163].) Both Kaswa and PIP argue outside reverse piercing of the corporate veil in their appellate briefs (albeit without mentioning the doctrine by name). At pages 21–22 of respondent's brief, PIP specifically stated: "[Kaswa] argues that the alter ego doctrine allows a court to disregard the corporate shield when an individual tries to shield personal assets by loading liability into the corporation, but not when the individual accepts the liability but loads the assets into the corporation. [¶] This 'one-way'/'two-way' distinction is 'a distinction without

a difference.' " PIP thus recognized the issue but stopped short of fully briefing it. By failing to cite pertinent authority to the trial court, Kaswa and PIP placed the trial court in the unacceptable position of having to make a difficult decision on an issue of first impression without the benefit of the parties' presentation of adequate research and analysis.

## I. *Outside Reverse Corporate Piercing of the Corporate Veil—Definition and Status in California*

The alter ego doctrine traditionally is applied to pierce the corporate veil so that a shareholder may be held liable for the debts or conduct of the corporation. Some courts recognize the corporate veil may be pierced in reverse so that a corporation may be held liable for the debts or conduct of a shareholder. (See Annot., Acceptance and Application of Reverse Veil-Piercing—Third-Party Claimant (2005) 2 A.L.R.6th 195, § 2.) "The typical 'reverse pierce' case involves a corporate insider, or someone claiming through such individual, attempting to pierce the corporate veil from within so that the corporate entity and the individual will be considered one and the same." (1 Fletcher Cyclopedia of the Law of Corporations (2006 rev. vol.) § 41.70, p. 258.) This is sometimes called "[i]nside reverse piercing." (*In re Phillips* (Colo. 2006) 139 P.3d 639, 644–645.)

A variant of the reverse piercing theory, sometimes called "outside" or "third party" reverse piercing, occurs when a third party outsider seeks to reach corporate assets to satisfy claims against an individual shareholder. (*In re Phillips, supra,* 139 P.3d at p. 645; see 1 Fletcher Cyclopedia of the Law of Corporations, *supra,* § 41.70; Annot., Acceptance and Application of Reverse Veil-Piercing—Third-Party Claimant, *supra,* 2 A.L.R.6th 195, § 2.) Perhaps the oldest reverse piercing case is *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.* (2d Cir. 1929) 31 F.2d 265 (*Kingston*) (opn. of Hand, J.). There, the court recognized as a matter of federal law the possibility a parent corporation may be liable for the acts of its subsidiary corporation when the parent corporation directly intervened in the transaction, "ignoring the subsidiary's paraphernalia of incorporation, directors and officers." (*Id.* at p. 267.) The court cautioned, however, that "such instances, if possible at all, must be extremely rare . . . ." (*Ibid.*)

The California Supreme Court has not spoken on the issue of outside reverse piercing of the corporate veil. Whether to accept or reject the doctrine is an issue of first impression in this state. In support of holding Kaswa liable for the judgment against Rangoonwala, PIP relies on a passage from a law review article published in 1925 and quoted in *Mesler v. Bragg Management*

*Co.* (1985) 39 Cal.3d 290, 300 [216 Cal.Rptr. 443, 702 P.2d 601] (*Mesler*): " 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' " In this passage, the *Mesler* court was quoting from a law review article entitled Comment, *Corporations: Disregarding Corporate Entity: One Man Company* (1925) 13 Cal. L.Rev. 235, 237, which was published even before the *Kingston* case. *Mesler* was a traditional alter ego case, not a reverse piercing case, and therefore does not compel us to accept reverse piercing.[2]

In *Taylor v. Newton* (1953) 117 Cal.App.2d 752, 760–761 [257 P.2d 68], the Court of Appeal concluded a corporation was liable on a judgment against the corporation's sole stockholder because the evidence supported a finding of alter ego. The court did not discuss the doctrine of reverse piercing or any of the problems it raises. Rather, the court relied on traditional alter ego law to conclude that adherence to the fiction of a separate corporate existence "would promote an injustice" to the stockholder's creditors. (*Id.* at p. 761.)

PIP argues *NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772 [256 Cal.Rptr. 441] supports imposition of liability on the corporation for a debt of a shareholder. That case was a traditional alter ego case: The plaintiff secured a judgment against the corporate defendant, then moved to amend the judgment to add the corporation's sole shareholder as a judgment debtor. (*Id.* at pp. 775–776.) The trial court granted the motion, but the appellate court reversed on the ground there was insufficient evidence to show the shareholder had an opportunity to litigate the underlying action between the plaintiff and the corporation. (*Id.* at pp. 776, 781.)

## II. *Cases Rejecting Outside Reverse Piercing of the Corporate Veil*

We agree with the sound reasoning and analysis of the cases rejecting outside reverse piercing of the corporate veil. The court in *Olympic Capital*

---

[2] In *S.E.C. v. Hickey* (9th Cir. 2003) 322 F.3d 1123, 1130–1131, the Ninth Circuit Court of Appeals affirmed a district court order freezing nonparty corporate assets to enforce a securities fraud disgorgement order against an individual shareholder. The Ninth Circuit addressed California alter ego law and discussed outside reverse piercing, but concluded reverse piercing did not apply because the asset freeze ordered by the district court did not depend on an alter ego relationship. (*Ibid.*)

*Corporation v. Newman* (C.D.Cal. 1967) 276 F.Supp. 646, 658 described outside reverse piercing as "a complete distortion of the alter ego doctrine." The court continued: "That doctrine has been invoked when fairness and justice require that the property of individual stockholders be made subject to the debts of the corporation. To apply such a doctrine here would be asking the court to apply the doctrine in one manner, i.e., make the property of the corporation the property of a stockholder, for the purposes of obtaining jurisdiction of the person of the stockholder and then to reverse the procedure, i.e., make the action of the individual stockholder the action of the corporation for purposes of creating liability in the name of the corporation. Neither reason nor law compel[s] such a gymnastic." (*Ibid.*, italics omitted.)

In *Cascade Energy and Metals Corp. v. Banks* (10th Cir. 1990) 896 F.2d 1557, 1576–1577 (*Cascade Energy*), the court, concluding Utah had not recognized outside reverse piercing, reversed the district court's order holding various corporations liable for a judgment against an individual shareholder who controlled the corporations. The court criticized outside reverse piercing, identifying three significant problems with the doctrine. First, reverse piercing "bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." (*Id.* at p. 1577.) Second, the court explained: "[T]o the extent that the corporation has other non-culpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter ego are subject to attachment." (*Ibid.*)

The *Cascade Energy* court also recognized that legal remedies adequately protected creditors from fraud. Thus, the court stated: "Absent a clear statement by the Supreme Court of Utah that it has adopted the variant reverse piercing theory urged upon us here, we are inclined to conclude that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability." (*Cascade Energy, supra,* 896 F.2d 1557, 1577.)

In *Floyd v. I.R.S. of U.S.* (10th Cir. 1998) 151 F.3d 1295 (*Floyd*), the court rejected outside reverse piercing as a matter of Kansas law. The *Floyd* court expanded on *Cascade Energy*'s criticism of the doctrine: "There are reasons beyond those identified in *Cascade* to deny an alter ego claim of this kind. For one thing, the prospect of losing out to an individual shareholder's

creditors will unsettle the expectations of corporate creditors who understand their loans to be secured—expressly or otherwise—by corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reverse-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit. Furthermore, as Judge Learned Hand suggested in what may be the earliest case to consider such a claim, outside reverse piercing is only appropriate in the rare case of a subsidiary dominating its parent." (*Floyd, supra,* 151 F.3d at pp. 1299–1300, citing *Kingston, supra,* 31 F.2d at p. 267.)

The *Floyd* court explained that disregard of the corporate form, as an equitable remedy, should be granted only when legal remedies are inadequate. When the corporation has been dominated by a controlling shareholder, the *Floyd* court concluded, "an agency or aiding and abetting theory may suffice to hold the corporation liable for the actions of that stockholder." (*Floyd, supra,* 151 F.3d at p. 1300.) In addition, "[s]tandard judgment collection procedures may also suffice to cover shareholder liability without expanding equitable theories of corporate liability." (*Ibid.*) The *Floyd* court concluded, "in the absence of a clear statement of Kansas law by the Kansas courts, we will not assume that such a potentially problematic doctrine already has application in that state." (*Ibid.*)

The Georgia Supreme Court rejected outside reverse piercing in *Acree v. McMahan* (2003) 276 Ga. 880 [585 S.E.2d 873]. The court, after reciting the criticisms of the outside reverse piercing doctrine expressed in *Cascade Energy* and *Floyd,* concluded: "Allowing outsider reverse piercing claims would constitute a radical change to the concept of piercing the corporate veil in this state and, thus, should be created by the General Assembly and not by this Court." (*Acree v. McMahan, supra,* 276 Ga. at p. 882 [585 S.E.2d at p. 875].)

III. *Cases Accepting Outside Reverse Piercing of the Corporate Veil and Why We Disagree with Them*

As the above cases explain, outside reverse piercing is a radical and problematic change in standard alter ego law. Nonetheless, cases accepting outside reverse piercing (outside of federal tax cases)[3] have accepted it as a logical

---

[3] Many courts have permitted the United States to use a reverse piercing theory to recover a taxpayer's delinquent tax liability from the taxpayer's alter ego business entity. (E.g., *Brownfield Inv. Corp., N.V. v. United States* (9th Cir., July 13, 1994, No. 92-16621) 1994 U.S.App. Lexis 18331; *Towe Antique Ford Foundation v. I.R.S.* (9th Cir. 1993) 999 F.2d 1387, 1390–1391; *Century Hotels v. U.S.* (5th Cir. 1992) 952 F.2d 107, 110; *Shades Ridge Holding Co., Inc. v. U.S.* (11th Cir. 1989) 888 F.2d 725, 728; *Loving Saviour Church v. United States* (8th Cir. 1984) 728 F.2d 1085, 1086; see also Annot., Acceptance and Application of Reverse Veil-Piercing—Third-Party

extension of the standard alter ego law either because both have the same equitable goals (see *S.E.C. v. Hickey, supra,* 322 F.3d at p. 1130 [reverse piercing "flows from the traditional piercing theory"]; *Minich v. Gem State Developers, Inc.* (1979) 99 Idaho 911, 917 [591 P.2d 1078, 1084] ["no reason in law or logic" to limit the alter ego doctrine to the traditional variety]; *C.F. Trust, Inc. v. First Flight, L.P.* (2003) 266 Va. 3, 11 [580 S.E.2d 806, 810] ["We conclude that there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action."]), or because outside reverse piercing is seen as the trend in authority (*Litchfield Asset Management Corp. v. Howell* (2002) 70 Conn.App. 133, 149–151 [799 A.2d 298, 312] ["We discern from these cases a growing recognition of the doctrine of reverse piercing of the corporate veil."]; *Goya Foods, Inc. v. Unanue* (1st Cir. 2000) 233 F.3d 38, 43 [reverse piercing allowed under New York law]). In *In re Phillips, supra,* 139 P.3d at page 645, the Colorado Supreme Court reasoned that Colorado permits outside reverse piercing "[d]ue to the similarities and parallel goals achieved in outside reverse piercing and traditional piercing."

■ The reasoning of those cases is unpersuasive and flawed. Traditional alter ego doctrine and reverse piercing, while having similar goals, advance those goals by addressing very different concerns. When a judgment debtor is a corporation, the judgment creditor cannot reach the assets of the individual shareholders due to limitations on liability imposed by corporate law. Traditional piercing of the corporate veil is justified as an equitable remedy when the shareholders have abused the corporate form to evade individual liability, circumvent a statute, or accomplish a wrongful purpose. (See *Mesler, supra,* 39 Cal.3d at pp. 300–301; see also 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, §§ 9, 11–12.)

The same abuse of the corporate form does not exist when the judgment debtor is the shareholder. In that situation, the corporate form is not being used to evade a shareholder's personal liability, because the shareholder did not incur the debt through the corporate guise and misuse that guise to escape personal liability for the debt. The judgment creditor can enforce the judgment against the shareholder's assets, including shares in the corporation. Upon acquiring the shares, the judgment creditor will have whatever rights the shareholder had in the corporation.

Claimant, *supra,* 2 A.L.R.6th 195, §§ 16, 17.) These cases recognize that "reverse piercing is a well-established theory in the federal tax realm" that advances the policies of "avoiding fraud and collecting delinquent federal taxes." (*U.S. v. Scherping* (8th Cir. 1999) 187 F.3d 796, 803, 804.)

■ The true issue that outside reverse piercing seeks to address is not the misuse of the corporate form to shield the shareholder from personal liability. Rather, the issue addressed by outside reverse piercing is the shareholder's transfer of personal assets to the corporation to shield the assets from collection by a creditor of the shareholder. In other words, outside reverse piercing seeks to protect the judgment creditor from the shareholder's fraudulent transfer of assets to the corporation. But, as explained in *Cascade Energy* and *Floyd*, conversion and fraudulent conveyance already afford judgment creditors protection in that situation. Outside reverse piercing, accomplished by the expedient means of a postjudgment motion, is an unacceptable shortcut to pursue those remedies.

To all of these problems recognized by other courts, we add one more: Here, PIP consented to the assignment of the franchise to Rangoonwala and Ahmed and knew the franchise was not being assigned to a corporation. PIP could have taken whatever precautions it believed necessary to protect its interests, for example, conditioning the assignment on Rangoonwala's owning the franchise assets, taking a security interest in Rangoonwala's Kaswa stock, or requiring a guaranty from Kaswa. Rangoonwala submitted a declaration stating that in October 2001 he informed PIP of his corporation, and PIP conceded its former director of credit and collections "might have known" of Kaswa's existence. There is no question Rangoonwala is personally liable to PIP for unpaid royalties owed under the Franchise Agreement, and PIP can enforce its judgment against Rangoonwala personally.

PIP's real concern is that Rangoonwala allegedly used his alter ego Kaswa to shield franchise assets from his creditors. However, to the extent Rangoonwala fraudulently conveyed assets to Kaswa (or fraudulently sold his Kaswa stock), PIP has legal means to try to reach those assets and the proceeds from them. Counsel for PIP acknowledged at oral argument that PIP did not pursue those legal remedies because amending the judgment to add Kaswa as a judgment debtor was simply more expedient.

The cases accepting outside reverse piercing have imposed limitations on its use to try to overcome its many flaws. Thus, in *In re Phillips, supra,* 139 P.3d 639, 646, the court imposed a requirement that "innocent shareholders and creditors be adequately protected before outside reverse piercing is appropriate under Colorado law." Because piercing the corporate veil is an extraordinary remedy, the court also required the trial court to consider alternative, adequate remedies (such as claims for conversion, fraudulent conveyance of assets, respondeat superior, and agency) before permitting outside reverse piercing: "When a less invasive, adequate remedy is available,

outside reverse piercing is discouraged." (*Id.* at p. 647.) In *C.F. Trust, Inc. v. First Flight, L.P., supra,* 580 S.E.2d 806, 811–812, the Virginia Supreme Court similarly cautioned that a court considering reverse piercing must weigh the effect of veil piercing on innocent investors and on secured and unsecured creditors, and must consider the availability of other remedies the creditor may pursue. (See also *Litchfield Asset Management Corp. v. Howell, supra,* 799 A.2d at p. 312, fn. 14 [acknowledging the concern that reverse piercing may harm innocent shareholders, but stating that concern "is not implicated by the facts of this case"].)

While these cases treat such flaws and concerns as limitations on the application of the doctrine of outside reverse piercing, we conclude they reflect inherent and insurmountable flaws in the doctrine itself. These concerns arise precisely because standard alter ego and outside reverse piercing are actually different theories, justified by different reasons, and address different issues. To ameliorate the flaws in outside reverse piercing, courts recognizing the doctrine have imposed qualifications and requirements which, in their totality, essentially eliminate the outside reverse piercing doctrine as a practical matter. Indeed, if all the requirements of outside reverse piercing are met, its application would be unnecessary to protect the judgment creditor. Judgment collection procedures offer judgment creditors adequate protection in situations where outside reverse piercing would not harm innocent shareholders and creditors, legal remedies are inadequate, and the traditional requirements of proving alter ego are met. By levying on the debtor's shares, the judgment creditor could place itself in the same position as the shareholder.

### IV. *PIP Failed to Meet the Requirements for Application of Outside Reverse Piercing*

█ Even if we were to accept outside reverse piercing, we would reverse because PIP failed to meet the requirements for its application. At the time of the litigation, Rangoonwala was not the sole shareholder of Kaswa. PIP failed to show that innocent creditors would be adequately protected. Amendment of a judgment to add an alter ego is an equitable procedure (*Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 21 [28 Cal.Rptr.2d 127]), and before applying outside reverse piercing, "the availability of alternative, adequate remedies must be considered by the trial court" (*In re Phillips, supra,* 139 P.3d at p. 647). PIP failed to establish its legal remedies were inadequate, and the record does not show whether the trial court considered the adequacy of PIP's legal remedies.

### Disposition

The amended judgment against Kaswa is reversed. Appellant to recover costs incurred on appeal.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 27, 2008, S164823.