Filed 11/7/14  Gaggero v. Knapp, Petersen & Clarke CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| STEPHEN M. GAGGERO et al., | B241675 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC286925) |
| v. | |
| KNAPP, PETERSEN & CLARKE et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court for the County of Los Angeles. Robert L. Hess, Judge.  Affirmed.

Westlake Law Group and David Blake Chatfield for Plaintiff and Appellant Stephen M. Gaggero.

Law Offices of Edward A. Hoffman and Edward A. Hoffman for Appellants Pacific Coast Management, Inc.; 511 OFW LP; Gingerbread Court LP; Malibu Broad Beach LP; Marina Glencoe LP; Blu House LLC; Boardwalk Sunset LLC; and Joseph Praske, as Trustee of the Aquasante Foundation, the Arenzano Trust, and the Giganin Trust.

Miller, Randall A. Miller and Steven S. Wang for Defendants and Respondents.

_____

## SUMMARY

In May 2010, we affirmed a judgment, including an attorney fee award of more than $1.2 million, against plaintiff Stephen M. Gaggero in a malpractice lawsuit he brought against defendants Knapp, Petersen & Clarke and several of its principals.

Plaintiff did not pay the judgment.

In April 2012, defendants moved to add additional judgment debtors to the judgment. These additional judgment debtors included (a) six entities (four limited partnerships and two limited liability companies) that were owned by plaintiff in 1998, with assets then valued at $35 or $40 million; (b) an entity that managed those assets; and (c) the trustee, Joseph Praske, of three trusts to which plaintiff had transferred his ownership of all the limited partnerships and limited liability companies in 1998. The trial court found all of these were plaintiff's alter egos, and added as additional judgment debtors the entities and Mr. Praske, in his capacity as trustee of the three trusts that held all the entities to which plaintiff had transferred his entire estate.

The additional judgment debtors and plaintiff appeal from the court's order, raising many arguments. They contend they cannot be alter egos as a matter of law, because "outside reverse veil-piercing" is a doctrine that applies to them and is forbidden in California. They contend the evidence of alter ego status is insufficient, claiming there is no "unity of interest and ownership" between them and plaintiff. They contend that, even if they were alter egos, defendants did not prove they controlled the litigation.

They contend the trusts are irrevocable (the trust documents are not in evidence), and irrevocable trusts may never be held liable for the debts of their settlors. They contend the trial court's findings that trustee Praske refused to produce the trust documents was not supported by the evidence (and that plaintiff's failure to produce them is not attributable to Mr. Praske).

They contend defendants are estopped to claim they are alter egos because defendants allegedly admitted in the underlying litigation that the additional judgment debtors and plaintiff were financially separate.

2

They contend the trial court invaded the probate court's exclusive jurisdiction over the internal affairs of the trusts.

They contend the evidence of alter ego status was known to defendants before the original judgment was entered in 2008, and defendants' failure to act until 2012 waived their alter ego claim.

And, plaintiff contends that affirming the alter ego finding in this case would "threaten the integrity of estate planning in California."

We find none of these arguments persuasive, and affirm the order granting defendants' motion to add the additional judgment debtors to the judgment.

## FACTS

This litigation began in 2002, when plaintiff sued defendants for malpractice. Plaintiff lost, and the trial court granted defendants' motion for attorney fees. We affirmed the judgment in an unpublished opinion in May 2010. (*Gaggero v. Knapp, Petersen & Clarke* (May 6, 2010, B207567) (*Gaggero I*).) In December 2010, the judgment was amended to include attorney fees and costs on appeal, plus postjudgment interest, and amounted to more than $1.8 million.

Defendants' initial efforts to enforce the judgment against plaintiff were predictably fruitless. We say "predictably" because one of the principal issues in the underlying malpractice case involved the tactics plaintiff employed with other judgment creditors. These included the assertion that he had no assets and was judgment-proof.

The trial court in the malpractice case described plaintiff's testimony on the subject this way (a description we found was fully supported by the record): "Between 1995 and 1998, [plaintiff] did extensive 'estate planning,' which supposedly resulted in all of his personal assets being transferred to various corporations, trusts and foundations. Supposedly, he retained absolutely no ownership interest in and no control over these assets. Indeed, he testified that he did not even have a checking account. When asked how he paid any bills, [plaintiff] said in substance that he submitted them to the trustee of his trust, who had absolute discretion to pay or not to pay them. If he wanted cash, it was available at the trustee's sole discretion – on sufferance, as it were. [¶] If this sounds

3

unusual or unbelievable, the record is clear that [plaintiff] repeatedly used precisely these assertions and arguments to discourage creditors who were seeking to collect moneys he owed them. The stonewall . . . and the claim of no personal assets that could be liened or attached, were . . . integral parts of the effort to discourage or defeat creditors." (See *Gaggero I, supra,* B207567, pp. 13-14 & fn. 8.)

This tactic continued unabated with respect to defendants' judgment, and in April 2012, defendants sought to add the "various corporations, trusts and foundations" to the judgment as additional judgment debtors. Below, we describe the creation of what the parties call plaintiff's "estate plan"; the evidence defendants submitted in support of their motion to amend the judgment to add additional judgment debtors; and the trial court's ruling.

**1.      The "Estate Plan"**

In 1997, plaintiff, a real estate investor and developer, hired Mr. Praske to create and implement an estate plan. At the time, the net value of the assets in plaintiff's estate (according to Mr. Praske) was approximately $30 million. (Plaintiff testified the gross fair market value of his properties was $35 to $40 million, and that "every asset, up to the time I met Joe Praske, was owned 100 percent by me, either by virtue of the membership interest, the shares, or the direct title to the property.")

The estate plan Mr. Praske designed was structured so that each real property plaintiff owned was transferred by grant deed to a limited liability company or limited partnership. These entities are four limited partnerships (511 OFW LP; Gingerbread Court LP; Malibu Broad Beach LP and Marina Glencoe LP); and two limited liability companies (Blu House LLC and Boardwalk Sunset LLC). As the entities themselves say, each of them was created "to own a distinct piece of [plaintiff's] real property." Plaintiff "would be the sole member of the limited liability company, and then would transfer that membership interest to a trust." Two trusts (the Aquasante Foundation and the Arenzano Trust) were created to hold the limited liability companies and limited partnerships. A third trust (the Giganin Trust) was created as a qualified personal residence trust, and ownership of plaintiff's principal residence (a 1,500-acre property with several buildings

4

on it) was in the name of that trust. According to Mr. Praske, the Giganin Trust is an irrevocable trust with substantial estate tax benefits, and gives the taxpayer (plaintiff) the right to reside at the property.

Mr. Praske is the trustee of the three trusts.[1] In June 2005, he testified the beneficiaries of the Aquasante Foundation and the Arenzano Trust were the same, namely, "a class of beneficiaries" comprised of "[a]ny member of the Gaggero family." Mr. Praske said that plaintiff was "a potential beneficiary" of the trusts, and that "[b]eing a potential beneficiary means that it is up to the trustee to decide each year among the class of beneficiaries who will be – who will receive distributable income." (Plaintiff also testified that he was "in a class of beneficiaries" of the Arenzano Trust.)

Mr. Praske had the sole and absolute authority to decide "which beneficiaries would receive anything from the trust." By 2005, the value of the "total estate" – the three trusts – had substantially increased, by "[a]t least 30 to 40 percent," since it was funded in 1998.

Mr. Praske and plaintiff have testified or given sworn statements that the trusts are irrevocable. As mentioned before, the trust documents are not in evidence, despite defendants' extensive attempts to discover them, as described more fully below.

Mr. Praske could not remember whether he had ever distributed cash to plaintiff from any of the trusts.

## 2. How the "Estate Plan" Works

Mr. Praske, in his capacity as trustee, appointed plaintiff manager of the assets for the entire estate plan. Plaintiff testified in 2005 that he was the asset manager for the

---

[1] Mr. Praske is also the president, secretary and director of Pacific Coast Management, Inc. (PCM), the corporation that manages the assets, and the general partner of two of the four limited partnerships. According to plaintiff, Mr. Praske "was the trustee or managing member or majority membership owner or limited liability – or limited partnership with the 100 percent ownership of all of those various entities, i.e., limited liability companies, limited partnerships, or trusts that formed general partnerships." Mr. Praske "had control over the ownership entities of each of the entities that they were a part of," and "had control over all of the entities in the estate plan that he created."

three trusts and for all of the entities owned by them.  Plaintiff's duties included "[b]uying and selling, financing, trading, everything."  His services included "[a]ll of the tasks that go along with property management as well as all of the aspects of the asset management, such as refinancing, dealing with tax issues, insurance issues, making decisions to buy, sell, buy or sell the asset, to improve the asset, overseeing any improvements to the asset, financing, designing some ultimate disposition of the asset."

PCM, an additional judgment debtor, is the management company for the assets held by the trusts.  PCM paid plaintiff $3,000 a month (as of 2001), plus the use of a company vehicle, for his services managing the assets of the additional judgment debtors. Plaintiff testified he was a managing director of PCM.  According to plaintiff, PCM "manages my estate, entities, and assets."  Further, PCM "[m]anaged assets, companies, me, my life, my family's life, trust, foundation, things of that nature."  Plaintiff testified that "[c]hecks were written by PCM," but "I paid for it, I give PCM the money.  PCM writes the checks.  They write checks for me.  [¶]  They pay my utilities.  They pay my credit card, they pay for my dogs' vet bills.  I mean PCM manages my life.  They are a management company for me personally and for other things."

The workings of the "estate plan" are illustrated by testimony Mr. Praske, plaintiff, and plaintiff's accountant gave in June and July 2005 in the *Yura* litigation. (This was a lawsuit plaintiff brought alleging failure to close on a real estate transaction. (See *Gaggero I, supra,* B207567, p. 5, fn. 2.))  Mr. Praske testified he had conferred with plaintiff about the availability of resources to purchase the property in question in the *Yura* litigation, which plaintiff wanted to purchase.  At this conference, plaintiff "was just confirming my commitment of the estate to purchase that property . . . ."  Mr. Praske was then asked, "What did you say to [plaintiff]?" and he responded, "I said, like I always do, I say yes."

Plaintiff also testified in the *Yura* case.  He was questioned about whether he had funds available (and from what sources) for the transaction.  He said:  "[P]art of the funds might have come from my trust or all of the funds could have come from my trust. [¶]  . . .  [¶]  . . .  [T]he funds would have come from me, if that's what you're asking.  I

6

mean, you're asking where I would have got the funds or would they be coming from me? [¶] . . . [¶] . . . It would have come from me into the escrow. But are you asking where I would have got them from? . . . [¶] . . . [¶] . . . At all times I commanded the resources to purchase this all cash or with a mortgage. And if there happened to be a 1031 exchange opportunity available, I would have exchanged into it with one of the entities that were owned by my trust." Plaintiff was asked, "[O]n and after January 1 of 2000 to the present date, have you commanded and do you command the resources necessary to close this transaction pursuant to the terms of the purchase agreement," and he answered, "Yes." At another point he testified, "Mr. Praske and myself always had the ability to . . . pull cash directly out of the trust."

Plaintiff also testified about what would happen once the property was purchased in his name. After the close of escrow, "I would have options at that point. . . . I would have the option, just like I did when I created – when I funded the trust with my asset, when I took my assets and created my trust, my personal trust. [¶] I could take this asset in my name, transfer it to an entity, a limited liability company, a limited partnership, a general partnership, or a corporation, and then have one of the trusts or the foundation subsume – if that's the right word – that entity into the estate plan, just like I did the other properties in 1997 and 1998; or I could just keep the property in my name."

James Walters, a certified public accountant who took over plaintiff's tax work in 1984 or 1985, testified that since 1988, plaintiff had been involved in 10 real estate purchase transactions. He met with plaintiff on all of those transactions, "to strategize as to tax planning and also strategize as to the estate planning, and actually to strategize as to which entities [plaintiff] managed would at times take ownership of the properties." During those meetings, decisions were made on those issues, and plaintiff made those decisions. Mr. Praske's role was "[a]dvice." Mr. Walters was asked, "And once [plaintiff] made the decision, was the decision – those decisions implemented?" He answered, "Absolutely." Mr. Walters specifically testified that plaintiff made the decision on "what entity would take title for these 10 various properties," and that plaintiff "command[ed] the resources necessary to purchase each of those properties."

7

Mr. Walters continued: "They all flow – the actual gains on these properties always flow through [plaintiff's] tax return, through the trusts and all the other entities."

**3.      Postjudgment Discovery**

After the judgment in the malpractice case, defendants conducted various forms of postjudgment discovery. On June 8, 2009, defendants took the third party debtor examination of Mr. Praske, "concerning property of the judgment debtor in [his] possession or control . . . ."

Mr. Praske was represented by plaintiff's attorney, David Chatfield.

Mr. Praske testified that plaintiff had no ownership interest in 511 OFW (an additional judgment debtor), and Mr. Chatfield instructed him not to answer any further questions about its operations on the basis of its "privacy rights and trade secrets" and irrelevance to the subject matter of the examination.

Mr. Praske further testified plaintiff had no ownership interest in additional judgment debtors Gingerbread Court LP, Blu House LLC, Boardwalk Sunset LLC, Malibu Broad Beach LP, and Marina Glencoe LP. He was instructed not to answer, on attorney-client privilege grounds, questions as to what plaintiff received in 1997 or 1998 in exchange for transferring his ownership in various properties to Gingerbread Court LP, Blu House LLC, and Boardwalk Sunset LLC. He did not recall whether plaintiff received any compensation for transferring property to Malibu Broad Beach LP, and testified plaintiff received compensation in exchange for transferring property to Marina Glencoe LP, but refused to describe it on counsel's instructions.

Mr. Praske testified that plaintiff has never received money or any assets from the Arenzano Trust. Mr. Praske testified the Arenzano Trust was an irrevocable, discretionary trust created under the laws of Anguilla, and plaintiff "has no right whatsoever to any property in the possession or control of the trust." He did not recall whether the Arenzano Trust had ever made any distributions to any of plaintiff's family members.

Defendants served plaintiff with postjudgment special interrogatories (set one) on April 25, 2011. On June 21, 2011, plaintiff filed responses to defendants' first set of

8

production requests. (The interrogatories and production requests themselves are not in the record.) No documents were produced. Plaintiff's response to the production requests included objections that defendants' request was "not reasonably limited to trust documents reflecting Gaggero's present interest as the beneficiary of a trust and therefore are not relevant to judgment enforcement . . . ." Plaintiff also objected that the request invaded his privacy rights and those of third parties, and responded that he "has no attachable interest as a beneficiary of any trust."

On August 9, 2011, defendants filed a motion to compel, and on October 5, 2011, the court held a hearing on defendants' motion to compel further responses to interrogatories. The court granted the motion "in its entirety"; ordered "[c]omplete, verified, supplemental responses, without further objection," to specified interrogatories, to be served by October 24, 2011; and imposed monetary sanctions of $2,000 on plaintiff and his counsel.[2]

On January 31, 2012, defendants filed a request for production of documents (set two). The production requests asked, among other things, for documents relating to the trusts. On March 20, 2012, plaintiff responded, but produced no documents. He objected on a host of grounds, and repeatedly responded that he had no documents responsive to the requests in his possession or control. Among his objections were that requests for documents "relating to assets transferred, sold or liquidated over a decade ago are clearly irrelevant to this judgment enforcement and will not be produced by plaintiff."

On April 30, 2012 (a few weeks after defendants filed their motion to amend the judgment to add judgment debtors), plaintiff filed supplemental responses to defendants' document requests. Again he produced no documents related to the trusts or his "estate plan," and objected on multiple grounds, including lack of relevance, privacy rights, attorney-client privilege and attorney work-product doctrines. He repeatedly stated he

---

**2** Plaintiff appealed from the order, and a year later, on October 3, 2012, this court dismissed the appeal (case No. B236834) on the court's own motion as having been taken from a nonappealable order.

9

had no trust documents responsive to the requests in his possession or control, and repeatedly stated that the trusts were irrevocable; he had no control or interest in them; they were set up over 13 or 14 years ago, well before defendants' judgment; and trust documents "are believed by plaintiff to be in the possession and control of the attorney and Trustee, Joseph J. Praske . . . ."

**4.      The Motion to Amend the Judgment**

On April 10, 2012, defendants filed their motion to amend the judgment to add the three trusts and their assets, seven separate entities, as additional judgment debtors, presenting the facts we have recited. Plaintiff opposed the motion, as did the additional judgment debtors, who made "a special appearance" to oppose the motion.

Counsel David Esquibias represented the seven entities and Mr. Praske in opposing defendants' motion. They argued (as did plaintiff) that the court had no authority to add them to the judgment because California law forbids "outside reverse piercing"; there was no evidence they were alter egos of plaintiff; they did not control the litigation between plaintiff and defendants; plaintiff did not represent their interests during any stage of the litigation; and judicial and collateral estoppel precluded defendants from claiming they were alter egos because at trial the court "ruled that [plaintiff] and the Entities were separate and that [plaintiff] had no authority to represent them [(the entities)], as [defendants] argued at trial."

The trial court granted defendants' motion at a hearing on May 29, 2012. At that hearing, counsel David Esquibias, who filed the opposition on behalf of the seven entities named in defendants' motion, stated he also represented Mr. Praske, as trustee for the three trusts that hold title to the seven entities. After the court indicated the motion appeared to have merit and solicited argument, Mr. Esquibias asserted previously unmentioned arguments, that the trusts were irrevocable; the probate court had exclusive jurisdiction over trust matters under Probate Code section 17000; the Probate Code requires that notice of defendants' motion be given "to the vested current income and principal and remainder beneficiaries of these trusts"; no such notice had been provided;

10

and under section 18200, the assets of an irrevocable trust are not available to the settlor's creditors.[3]

The court asked Mr. Esquibias if there was "a reason why, if this is a meritorious argument, it was not included in the opposition." Mr. Esquibias responded that he was "specially appearing for the purpose of arguing jurisdiction and notice," and that "I have no explanation as to why it wasn't in the opposition. I am late to this party." (No doubt, the trial court found this to be as strange a response as we do, since Mr. Esquibias himself submitted the written opposition two weeks previously, denominating it a "notice of special appearance to oppose and opposition" to defendants' motion.)

When asked why he held back the arguments, counsel said "[i]t was not designed to ambush the moving party," and perhaps the matter could be continued for briefing. The court said, "This is the time and place for the hearing on this motion," and then asked if there was evidence in support of counsel's assertions that the trusts were "irrevocable and subject to this that and the other." Counsel admitted there was nothing "other than their [defendants'] own statements in their pleadings which are considered admissions that the trusts are irrevocable."

Mr. Esquibias said, "We will provide a copy of the trust documents to counsel upon notice to the beneficiaries," and the court inquired, "How would they know who the beneficiaries are?" The court continued: "[Y]ou are asserting a series of things which find no evidentiary support and the reason they have no evidentiary support . . . is that you have, as I understand it, you or Mr. Gaggero have precluded the other side from access to the very information that you claim is necessary for them to give notice."

Mr. Esquibias responded that he "ha[d] a resolution." He said he was "new to this case" and stated: "I will make sure that opposing counsel has a copy of the trust documents, so that she can apprise the situation herself. She can give notice." Counsel said he was not present at the depositions (apparently referring to Mr. Praske's third party

---

[3] Probate Code section 18200 states: "If the settlor retains the power to revoke the trust in whole or in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor."

11

debtor examination, at which plaintiff's lawyer, Mr. Chatfield, represented Mr. Praske), "but I will tell the court now, and opposing counsel, I now represent Mr. Praske in his capacity as trustee of these trusts, and we intend to completely and fully cooperate with the requests for the documentation. [¶] There is no reason why it should not be disclosed."

The court asked if there was a reason why counsel did not have the trust documents at the hearing, and counsel said he had them, but his notes were on the documents. He stated his intention "to be fair and clear and transparent," and asked for an order that the documents not be made public, to which the court responded that counsel could have applied for a protective order in a timely fashion. The court further stated that Mr. Praske, "during these preceding times," had not had independent counsel: "He has used Mr. Gaggero as [*sic*] counsel, which suggests to me – certainly leads to an inference, that the positions taken were coordinated positions." The court concluded that this "[s]mells like more delay."

Mr. Esquibias said the delay would be short, and went on to renege on his earlier statement that "we intend to completely and fully cooperate with the requests for the documentation." He said: "We would only want to provide information that is either agreed upon between myself and opposing counsel or if we could not come to some type of agreement, whatever this court would determine to be relevant."

The court declined to allow further delay. The court concluded that "these persons and entities are alter egos of Mr. Gaggero and clearly, clearly, it would be inequitable not to pierce the veil – not to get [at] these entities which are his alter ego. Since he has this substantial judgment against him, and he has attempted to use these devices to put his assets beyond the reach of legitimate creditors, and we have had a full and fair opportunity to litigate this. [¶] . . . [¶] I know at the moment there is . . . zero evidence in the record to support the position that there is a plethora of – I don't know who these people are. [¶] And in fact, I do know that Mr. Praske was extraordinarily vague when he was questioned at trial about the identities of these . . . supposed beneficiaries. [¶] You know, the decision was made long ago to keep the trust documents out of the hands

12

of the defense, and now to try and invoke the terms of it, you know, without giving it to the other side. . . . [T]his is a situation where these issues have been percolating for a long time, and there is a fundamental unfairness to making [defendants] jump through all these hoops to collect the judgment and saying no, no you can't have x, y, and z, and then coming in at the last minute making arguments not set forth in the pleadings [based] on evidence, not before the court and saying Judge give us a do over. [¶] There is a fundamental unfairness to that."

On the evidence of alter ego status, the court observed: "[T]he exhibits attached to the motion contain testimony of both Mr. Gaggero and Mr. Praske showing that the only interest of the specially appearing parties is to protect 100 percent of Mr. Gaggero's assets, both personal and business. Praske is the only trustee of the trust and foundation involved in the motion. He is one of only two officers in PCM. PCM pays everything at Gaggero's wishes without resistance or hesitance. Praske is also the registered agent for service of process at each of the business entities. [Defendants'] evidence shows that Mr. Gaggero's own accountant testified under penalty of perjury that the gains and losses for the assets and the estate plan, ultimately flow through Mr. Gaggero's tax returns, which is more evidence of alter ego status. [¶] Gaggero controlled the litigation. He did so by the way of the financial assets of the specially appearing parties. Their interests are aligned with Mr. Gaggero. Without them – without Mr. Gaggero they wouldn't even exist. Mr. Praske testified that the sole purpose of the existence of the specially appearing parties is to hold Mr. Gaggero's assets. They are one and the same. That is the bottom line."

The court rejected Mr. Chatfield's contention that Mr. Praske's testimony was that "Mr. Gaggero makes the recommendation, and he [(Mr. Praske)] makes the decision," concluding that "Mr. Praske is for all intents and purposes a rubber stamp."

The court's order granting defendants' motion was signed and entered the same day. On June 1, 2012, plaintiff's attorney filed a notice of appeal on behalf of plaintiff and the additional judgment debtors.

13

**DISCUSSION**

1.      **Preliminary Motions**

Both sides filed motions during the briefing of this appeal.

The additional judgment debtors ask us to take judicial notice of several documents filed in the trial court in this case after the notice of appeal:  the August 6, 2012 third amended judgment; the trial court's November 5, 2012 order authorizing the receiver appointed in this case (the subject of a separate appeal by additional judgment debtors) to approve and facilitate a financing transaction arranged by four of the additional judgment debtors; and defendants' December 3, 2012 notice of satisfaction of the judgment.  These documents are relevant, they say, to show they paid the judgment, were prejudiced by the order adding them as judgment debtors, and their payment did not waive their right to seek relief in this court.  None of these points is at issue in this appeal.  While there is nothing controversial about the documents, they are not relevant to any matter at issue in this appeal, and there is no point in judicially noticing them.

Defendants ask us to dismiss plaintiff's appeal on the ground he lacks standing to prosecute it.  They say he has not been injured by the order adding judgment debtors, because he says he is completely separate from them.  We see no point in expending judicial resources on interesting theoretical issues, or on plaintiff's many arguments about why he is nevertheless aggrieved by the order.  Moreover, there is no substantial difference in the issues plaintiff and the additional judgment debtors raise on appeal, all of which we must consider in any event.  And, given our disposition of this appeal, plaintiff is, as a practical matter, very much aggrieved by the order.

2.      **General Principles on Adding Debtors to the Judgment**

Code of Civil Procedure section 187 authorizes a trial court to amend a judgment to add judgment debtors.  (*NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778 (*NEC Electronics*).)  "Judgments are often amended to add additional judgment debtors on the grounds that a person or entity is the alter ego of the original judgment debtor."  (*Ibid.*)

14

The Supreme Court tells us that the alter ego doctrine "arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).) *Mesler* instructs that there is "no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." (*Id.* at p. 300.) There are "two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' [Citation.] And 'only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual.' [Citation.]" (*Ibid.*)

*Mesler* explained the alter ego doctrine as follows: "The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' [Citation.]" (*Mesler, supra,* 39 Cal.3d at p. 301 [holding that a parent corporation's liability as alter ego of its subsidiary corporation continued after settlement with the subsidiary; "[t]o hold otherwise would be to defeat the policy of promoting justice that lies behind the alter ego doctrine"].)

Alter ego liability may be applied to a trustee. (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 522 (*Greenspan*) [if the trustee is the alter ego of an individual, then the individual "may be considered the owner of the [trust's] assets for purposes of satisfying the judgment"; " '[t]rustees are real persons . . . and, as a conceptual matter, it's entirely reasonable to ask whether a trustee is the alter ego of a defendant who made a transfer into [the] trust' "; " '[a]lter-ego doctrine can therefore provide a viable legal theory for creditors vis-à-vis trustees' "]; cf. *Wood v. Elling Corp.* (1977) 20 Cal.3d 353, 365-366 [allegations that corporate defendants were alter egos of individual defendants were barred by statute of limitations on fraudulent conveyance cause of action, but plaintiff should have been allowed to amend his complaint, because "[i]f it were alleged and proven that the two trusts in question [which owned the corporate defendants] were

15

*themselves* alter egos of the [individuals], those trusts would essentially drop out as independent legal entities"].)

" 'The decision to grant an amendment . . . lies in the sound discretion of the trial court. "The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done." ' [Citation.]" (*Greenspan, supra,* 191 Cal.App.4th at p. 508.) Where, as here, facts are in dispute, we review the trial court's fact findings for substantial evidence. (*NEC Electronics, supra,* 208 Cal.App.3d at p. 777.)

**3.     Issues Raised by the Additional Judgment Debtors**

We turn to the specific contentions the additional judgment debtors raise on appeal, discussing first the several bases on which they claim they may not be added to the judgment as a matter of law.

**a.     "Reverse piercing" of the corporate veil (a red herring)**

Additional judgment debtors contend they may not be added to the judgment because "reverse piercing" of the corporate veil is "forbidden by California law." They rely on one opinion, *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1512-1513 (*Postal Instant Press*) to argue that, while traditional alter ego doctrine allows an individual shareholder to be held liable for claims against a corporation, it does not allow a corporation to be held liable for claims against an individual shareholder. *Postal Instant Press* rejected the "variant of the alter ego doctrine, called third party or 'outside' reverse piercing of the corporate veil," and held that "a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability." (*Id.* at p. 1513.)

The opinion in *Postal Instant Press* includes a thorough analysis of cases from California, federal and other state courts discussing "outside reverse piercing of the corporate veil," both cases accepting, and others rejecting that theory of alter ego. The *Postal Instant Press* opinion rejected it as "a radical and problematic change in standard alter ego law." (*Postal Instant Press*, *supra,* 162 Cal.App.4th at p. 1521.) The opinion explains outside reverse piercing of the corporate veil creates unanticipated exposure for innocent investors and secured and unsecured creditors who relied on the impregnability

16

of the corporate form; and that other remedies are available to the creditor of an individual shareholder, such as enforcing the judgment against the shareholder's assets, including his shares in the corporation. (*Id*. at p. 1524.)

We find these are sound principles, consonant with *Mesler*'s directive to look to "the circumstances of each particular case." (*Mesler, supra,* 39 Cal.3d at p. 300.) In *Postal Instant Press*, the corporation at issue had other shareholders, the plaintiff failed to show that innocent creditors would be adequately protected, and the plaintiff admittedly did not pursue other available legal remedies because it was "simply more expedient" to add the corporation as a judgment debtor. (*Postal Instant Press, supra,* 162 Cal.App.4th at pp. 1524, 1523.) In other words, the equities of the case did not justify disregarding the corporate form.

The facts and governing law in this case are entirely different. The additional judgment debtors are Mr. Praske, as the trustee of three trusts plaintiff created for the sole purpose of holding his assets, and the entities plaintiff transferred into the trusts which comprise the trust assets. Unlike a corporation, a trust is not a legal person which can own property or enter into contracts. Since a trust is not a legal entity, it cannot sue or be sued. A trust is a relationship by which one person holds legal title for the benefit of another person. (*Greenspan*, *supra*, 191 Cal.App.4th at p. 521.)

We find neither the holding nor the reasoning of *Postal Instant Press* govern whether the additional judgment debtors were properly found to be alter egos of plaintiff for the reasons set forth more fully below.

b.     **The ownership issue**

Additional judgment debtors argue that, because plaintiff transferred his ownership of the entities to the trusts, and he is not the trustee, he has no ownership interest in any of the additional judgment debtors and, ergo, alter ego doctrine cannot apply. They say that defendants repeatedly conceded – by simply describing plaintiff's transfer of his assets to the entities, and then his transfer of ownership of the entities to the trusts – that plaintiff does not own any of them or their assets, and this "binding judicial admission" is fatal. And so, they think, game over.

17

We reject this simplistic, form-over-substance notion, and conclude on the evidence in this case that plaintiff had a sufficient ownership interest to satisfy alter ego doctrine.

### i. Ownership in the trust context

Additional judgment debtors correctly point out that the cases uniformly say that one of the "two general requirements" for disregarding the corporate form is " 'that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist . . . .' [Citation.]" (*Mesler, supra,* 39 Cal.3d at p. 300.) They further point out that one Ninth Circuit case has said that "ownership of stock is an absolute requirement for an alter ego finding." (*SEC v. Hickey* (9th Cir. 2003) 322 F.3d 1123, 1129, *id.* at p. 1130.)

But this case does not involve an individual and a corporation. It involves trusts. There are no stock owners of a trust. It should go without saying that cases are not authority for propositions they have not considered. (And, as many cases have noted, "[b]ecause it is founded on equitable principles, application of the alter ego [doctrine] 'is not made to depend upon prior decisions involving factual situations which appear to be similar,' " and " ' "the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." ' [Citations.]" (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248.)

Here, it is of course true that, on paper, plaintiff owns nothing. On paper, plaintiff depends, for everything in life (except, perhaps, the $3,000 a month he earns for managing a $40-million portfolio of assets), on the generosity of Mr. Praske. But the law is not so unyielding that it cannot take account of practical realities. Plaintiff transferred his ownership of assets worth tens of millions of dollars to entities that exist for the sole purpose of owning his properties, and then transferred his ownership of those entities to the trusts, and appointed Mr. Praske the trustee. So, Mr. Praske has legal title to these entities in his capacity as trustee. But the evidence demonstrated that Mr. Praske is plaintiff's "rubber stamp." Moreover, under general principles of trust law, "trust beneficiaries hold 'an equitable estate or beneficial interest in' property held in trust and

18

are ' "regarded as the real owner[s] of [that] property." ' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319; see *In re Schwartzkopf* (9th Cir. 2010) 626 F.3d 1032, 1039 [under California law, "equitable ownership in a trust is sufficient to meet the ownership requirement for purposes of alter ego liability"].)

### ii.    Substantial evidence of ownership

Substantial evidence supported the trial court's alter ego findings.  Like the trial court, we do not believe that Mr. Praske has any actual authority to decide what to do with the assets held by the trusts.  It is plaintiff who exercises that authority.  Plaintiff's testimony in the *Yura* litigation showed that he treated the trusts like his own personal piggy banks.  The trial court described Mr. Praske as plaintiff's "rubber stamp." Extending the piggy bank analogy, we find the record shows Mr. Praske was the rubber plug on the underside of the piggy banks that plaintiff could remove any time he wanted to spill funds into his own hands at will.

Plaintiff plainly said that he could get funds from his trust to buy the property, and then either put the property into the "estate plan" *or* keep it in his own name.  Since Mr. Praske said yes, "like I always do," to providing funds from the trust to purchase property that plaintiff could keep in his own name, it seems quite clear that plaintiff (who is, Mr. Praske admits, "a potential beneficiary" of the trusts) not only controls the trusts (and the entities owned by the trusts) but also – and certainly in a court of equity – has an ownership interest in trust assets within the contemplation of alter ego doctrine.  (See *Greenspan, supra,* 191 Cal.App.4th at p. 518 [if the trustee is the alter ego of an individual, then the individual "may be considered the owner of the [trust's] assets for purposes of satisfying the judgment"].)  So it is here.

### c.    Other alter ego requirements and supporting evidence

Additional judgment debtors also contend that the evidence was insufficient to establish the required unity of interest and ownership.  They rely on *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065 (*Misik*), where the court listed some of the "many factors to be considered" in determining whether there is sufficient unity of interest and ownership that "the separate personalities of the individual and the corporation no longer exist . . . ."

19

(*Id.* at p. 1073.) Additional judgment debtors observe that no evidence was offered on most of the factors that *Misik* lists (such as commingling of funds, failure to maintain records, inadequate capitalization, and so on).

But the question is not what factors were *not* present, but what circumstances *were* present to establish the required unity of interest and ownership. As *Misik* also observes, "[t]his list of factors is not exhaustive"; the enumerated factors "may be considered with others under the particular circumstances of each case"; and no single factor is determinative. (*Misik, supra,* 197 Cal.App.4th at p. 1073.) Instead, " ' "a court must examine all the circumstances to determine whether to apply the doctrine." ' [Citation.]" (*Ibid.*)

That is just what the trial court did: it examined all the circumstances. Most of the laundry list of factors recited in *Misik* did not apply to the arrangements plaintiff and Mr. Praske implemented in this case. Others did: the ownership factor already considered, and the use of the trusts and the entities "as a mere shell, instrumentality or conduit for the business of an individual." (*Misik, supra,* 197 Cal.App.4th at p. 1073.) We have recited the established facts at length in parts 1 and 2 of the facts, *ante*, and will not repeat them here. Plainly the evidence was sufficient for the trial court to conclude that "under the particular circumstances" (*ibid.*) plaintiff and additional judgment debtors were "one and the same."

Additional judgment debtors complain that defendants did not present evidence specific to any of them, "treated all ten of them as a single unit" and did not prove "any facts specific to any of the individual trusts, LLCs or LPs." That is because plaintiff and Mr. Praske devised a single enterprise – which they conveniently denominate an "estate plan" – controlled by plaintiff to his own ends, one of which was to place his personal assets beyond the reach of legitimate creditors.

Finally, additional judgment debtors say the other alter ego requirement – that adherence to the fiction of separate existence would "sanction a fraud or promote injustice" (*Misik, supra,* 197 Cal.App.4th at p. 1073) – is not met either. The facts we have related patently demonstrate otherwise.

20

#### d. Control of the litigation

Some authorities tell us that adding a judgment debtor to a judgment requires both that the additional judgment debtor be an alter ego of the original judgment debtor *and* "that the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." (*Triplett v. Farmers Ins. Exchange* (1994) 24 Cal.App.4th 1415, 1421 (*Triplett*).) "[T]he due process concern raised when new parties are named after judgment is to determine not only alter ego status but also whether there was sufficient control over the underlying litigation to permit the opportunity to contest the underlying judgment." (*Ibid.*)

Seizing on this principle, additional judgment debtors point to the trial court's express finding that it was plaintiff who controlled the underlying litigation. They say this finding necessarily means that they did *not* control the litigation, and therefore cannot be added to the judgment.

While due process considerations are distinct from alter ego findings, under the circumstances here there are no due process considerations that prevent amending the judgment. This is not a case where the interests of the individual defendant in the underlying litigation were different from those of the alter egos. Plaintiff fought tooth and nail to prevent the attorney fee award against him (and, perforce, to prevent any part of the assets he had transferred to his alter egos from being used to satisfy his judgment creditors). As was the case with the real estate developer in *Greenspan* who transferred his limited liability companies to a trust he managed, plaintiff's interests were the same as his trusts and the entities they hold; if at any point plaintiff wanted to protect the funds of a particular entity, he could make a transfer to another entity. In reality, plaintiff was the head of a single enterprise and controlled the litigation on behalf of all of them. (Cf. *Greenspan, supra,* 191 Cal.App.4th at p. 510 [real estate developer who transferred ownership of limited liability companies to a trust he managed viewed all the entities as a single enterprise, so he did not consider their "distinct" interests "because, as far as he was concerned, their interests were identical to his own"].)

21

### e.     The irrevocability claim

Additional judgment debtors contend that, as a matter of law, the trustee may not be added to the judgment because the trusts are irrevocable, and the assets of an irrevocable trust can never be reached by the settlor's creditors.  We do not agree, for multiple reasons, including absence of the trust documents from the record.  (See pt. 3.f., *post*.)  But even if the trusts were irrevocable, that principle has no pertinence where the trustee is the alter ego of the settlor of the trust.

First, we do not agree with additional judgment debtors that *Laycock v. Hammer* (2006) 141 Cal.App.4th 25 (*Laycock*) is controlling here.  In *Laycock*, the court held that, once the settlor of an irrevocable trust transferred an insurance policy to the trust, "he no longer had any ownership interest in the policy and it was not subject to the claims of his creditors."  (*Id.* at p. 27.)  The court cited Probate Code provisions[4] and said "[t]here are no cases that permit the settlor of a trust to make an irrevocable trust revocable by way of conduct after the trust has been established" (*id.* at p. 30), and "a settlor's conduct after an irrevocable trust has been established will not alter the nature of such a trust."  (*Id.* at p. 31.)

*Laycock* did not involve circumstances where the trustee of the trust was the alter ego of the settlor (and, as additional judgment debtors themselves have pointed out, cases are not authority for points they did not consider).  *Greenspan*, on the other hand, did involve circumstances where the trustee of a trust was the alter ego of the settlor, and the trust in that case was an irrevocable trust, created by the settlor for the benefit of his children.  (*Greenspan, supra,* 191 Cal.App.4th at p. 497.)  The court held the plaintiff

---

**4**     Probate Code section 18200 states that "[i]f the settlor retains the power to revoke the trust in whole or in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor."  And section 19001, subdivision (a) states that, upon his or her death, "the property of the deceased settlor that was subject to the power of revocation at the time of the settlor's death is subject to the claims of creditors of the deceased settlor's estate and to the expenses of administration of the estate to the extent that the deceased settlor's estate is inadequate to satisfy those claims and expenses."

22

"properly sought to add . . . the trustee of the . . . Trust, as a judgment debtor" (*id.* at p. 518), and that if the trustee is the alter ego of an individual who made a transfer into the trust, then the individual "may be considered the owner of the [trust's] assets for purposes of satisfying the judgment." (*Ibid.*; see *In re Schwartzkopf, supra,* 626 F.3d at p. 1040 [holding that an irrevocable trust (*id.* at p. 1034) was an individual's alter ego].)

Second, the record is insufficient to conclude the trusts were irrevocable anyway. As *Laycock* tells us, California courts considering the issue "have looked to the express terms of the trust instrument in determining whether a trust is revocable or irrevocable." (*Laycock, supra,* 141 Cal.App.4th at p. 30.) The trust instruments are not in the record, and that is because plaintiff and Mr. Praske have not produced them. (See part 3.f., *post.*) This likewise disposes of the assertion that defendants had to prove the trusts were revocable and did not meet that burden. Probate Code section 15400 provides that "[u]nless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor." Even if defendants were required to produce proof of revocability (and *Greenspan* supports the conclusion the issue is irrelevant), it was plaintiff and Mr. Praske who eliminated the possibility of doing so.

f.     **The failure to produce trust documents**

In a related argument, additional judgment debtors assert that the trial court erroneously found, without evidentiary support, that they "had committed misconduct" by refusing to produce the trust instruments or identify the beneficiaries of the trusts during postjudgment discovery. (We note parenthetically that the references by additional judgment debtors to Mr. Praske's "misconduct," "purported misdeeds" and "wrongful[]" withholding of evidence are strictly their own characterizations, not those of the trial court.) Additional judgment debtors say the alter ego decision "rests entirely" on this finding, and that the trial court was wrong, because Mr. Praske himself never refused, and indeed was never asked, to turn over the disputed documents.

This argument ignores the evidence. It ignores plaintiff's response to the production requests (objecting on grounds of a constitutional right to privacy as well as attorney-client privilege and attorney work product). It ignores the evidence that

Mr. Praske "always" said yes to plaintiff. It ignores the evidence that plaintiff's counsel represented Mr. Praske at his third party debtor examination. It ignores the evidence that Mr. Praske followed plaintiff's counsel's instructions not to answer questions about the operations of the entities to which plaintiff had transferred his properties (except to say plaintiff did not now own them). And it ignores the fact that at the hearing, Mr. Praske's own counsel, after first saying that Mr. Praske intended "to completely and fully cooperate with the requests for the documentation," said, "I know in my mind what information they need," and that he would only provide information either agreed upon between counsel or "whatever this court would determine to be relevant." (As the court observed, this was "a contingent offer" and "of limited scope.")

In other words, we find apt the trial court's description of plaintiff and Mr. Praske as being "joined at the hip," whose "positions taken were coordinated positions." We find no error in the trial court's inference that Mr. Praske had effectively "refused" to produce the trust documents, with the result that the record was devoid of evidentiary support for the claims counsel made – belatedly and with no excuse – at the hearing.

Additional judgment debtors further contend their due process rights were violated because they "had no notice that they would need to rebut a claim that Praske had withheld documents," having "only learned of the accusation at the hearing," and "[a] ruling that is entered without notice to the affected parties is void." (In a similar vein, they claim the court's "refusal to let [them] produce the trust documents before penalizing them" was "reversible per se" and violated their constitutional right to a fair hearing.)

These are baseless contentions. Additional judgment debtors are the ones who generated the issue in the first place, by raising last-minute claims about the trusts that they failed to raise in their opposition papers. The only reason they "had no notice" was that they gave none. (Defendants' counsel pointed out at the hearing that Mr. Praske testified these were offshore trusts, never filed with any United States court, with "independent confidentiality provisions" and "had we [(the defendants)] any idea this would be an argument they would raise we would have pulled excerpts from the debtor

24

examination to address that.")  These claimed "structural" errors, purportedly "reversible per se," are neither.  They are arguably as far from due process violations as it is possible to get.

Next, additional judgment debtors characterize the court's ruling as "an evidentiary and/or issue sanction for discovery abuses," and then tell us all the reasons why such a discovery sanction is improper.  The short answer to these claims is that the court did not impose an evidentiary sanction.  The court refused to continue the hearing, concluding it would be fundamentally unfair to do so in light of the history of the litigation.  And the trial court did not "presume" that plaintiff and additional judgment debtors were "one and the same"; the court found they *were* "one and the same" based on the evidence we have described at length.  The court's refusal to continue the hearing was within the trial court's sound discretion, and we see no basis upon which to find any error.

### g.  Judicial estoppel and related claims

Additional judgment debtors assert that in the underlying litigation, "[b]ased on [defendants'] argument, the trial court expressly found that Gaggero was separate from the estate he had created years earlier," so judicial estoppel prevents defendants from making an alter ego claim.  The quoted statement distorts the facts, which provide no basis for a finding of judicial estoppel.

In fact, there were neither arguments nor trial court findings that plaintiff was "financially separate" from PCM or the other additional judgment debtors.  The arguments and findings were that plaintiff so testified, and that he failed to produce any evidence that he personally paid any attorney fees to anyone who represented him, or that he had any obligation to repay the sums that PCM or others paid for him.  The trial court said, "As far as the evidence goes, the entities paid whatever sums were expended entirely gratuitously."  In short, the trial court concluded that, because plaintiff took the position throughout the litigation that "he ha[d] no control over any funds, in an attempt to put his assets outside the reach of creditors," the doctrine of judicial estoppel "would apply to prevent any change in position," so it "is appropriate to take Mr. Gaggero at his

25

word on this point and let him now accept the consequences.  Since he paid nothing, he can recover nothing."  This was obviously not a finding that plaintiff and additional judgment debtors were actually separate financially.

In sum, there was no argument, and no finding, precluding an alter ego claim.  For the same reasons, the argument by additional judgment debtors that the (nonexistent) finding of financial separation is "law of the case" is equally baseless.  Likewise, their contention that the amended judgment adding them as debtors "directly contradicts the original judgment" and therefore cannot stand – which is based on the same nonexistent trial court finding of financial separation – necessarily has no merit.

### h. Probate court jurisdiction

Additional judgment debtors claim that the trial court had no jurisdiction to amend the judgment to add them as judgment debtors because the probate court "has exclusive jurisdiction of proceedings concerning the internal affairs of trusts."  (Prob. Code, § 17000, subd. (a).)  The trial court did not consider this claim because additional judgment debtors failed to assert it in their opposition papers.  (See pt. 3.f., *ante*.)  It has no merit in any event.  This is not a proceeding concerning the internal affairs of the trusts, and none of the authorities that additional judgment debtors cite suggests otherwise.  The probate court does not have exclusive jurisdiction of actions and proceedings "by or against creditors or debtors of trusts" or actions and proceedings "involving trustees and third persons."  (§ 17000, subd. (b)(2)&(3); cf. *Greenspan*, *supra*, 191 Cal.App.4th at p. 522 [civil action where the plaintiff "properly sought to add . . . the trustee of the . . . Trust, as a judgment debtor"].)

### i. Waiver

Additional judgment debtors claim that a judgment may not be amended to include alter ego debtors if the judgment creditor was aware of the alter ego relationship before the judgment was entered.  The only case authority they cite for this proposition is *Jines v. Abarbanel* (1978) 77 Cal.App.3d 702 (*Jines*), which does not support it.  In *Jines*, the trial court added a medical corporation to a malpractice judgment against the physician after the judgment, and the Court of Appeal reversed.  The medical corporation was

26

defendant's employer. There was "no suggestion of any . . . abuse" of the corporate privilege, and no need to disregard the separateness of the employer and employee in order to do justice, because a corporate employer is liable for the torts of its employee in the course of employment, and could have been sued on that basis. (*Id.* at pp. 715-716.) In short, alter ego doctrine simply did not apply, and so there was no legal basis for a postjudgment order adding the corporation as a judgment debtor. (*Id.* at p. 716.) That is not this case.

Additional judgment debtors then say defendants did not act with due diligence in adding them as judgment debtors, relying on *Alexander v. Abbey of Chimes* (1980) 104 Cal.App.3d 39 (*Alexander*), where the court found ample evidence for disregarding the corporate entity, but found the motion to amend the judgment had not been timely made. (*Id.* at p. 47.) In that case, the plaintiffs waited nearly seven years after the judgment was final to seek to add the alter ego to the judgment, even though they knew or should have known of the alter ego status either at the time of the original proceedings or shortly thereafter. (*Id.* at p. 48.) Further, there was "no suggestion that [the plaintiffs had] ever made any effort to satisfy the judgment" before they filed the motion to amend the judgment. (*Ibid.*)

Here, the original judgment was entered on February 5, 2008, and plaintiff's appeal resulted in an automatic stay of enforcement until May 2010, when the judgment was affirmed on appeal. The amended judgment including costs on appeal was not entered until December 2010. Defendants moved to add judgment debtors on April 10, 2012, after conducting various forms of postjudgment discovery during 2011 and 2012. In short, this is not a case like *Alexander*, where the plaintiff did nothing at all for seven years after the judgment was final.

The general rule is that " ' "a court may amend its judgment *at any time* so that the judgment will properly designate the real defendants." ' " (*Greenspan, supra,* 191 Cal.App.4th at p. 508, italics added.) The procedure is an equitable one, and the decision lies in the court's sound discretion. We see no reason on this record to find any absence of diligence by defendants in bringing their motion.

27

**j.      The "estate planning" argument**

Finally, plaintiff contends that affirming the trial court's alter ego finding will "threaten the integrity of estate planning in California" and that "no estate plan will ever be safe in a California court." No such consequences flow from this opinion. We merely recognize the previously established principle that alter ego doctrine may be applied to a trustee, and if the trustee *is* the alter ego of an individual, then the individual "may be considered the owner of the [trust's] assets for purposes of satisfying the judgment." (*Greenspan, supra,* 191 Cal.App.4th at p. 522.) The *Mesler* court's observation in the context of corporations likewise apply here: " 'In the instant case there may well have been various business reasons sufficient to justify and support the formation or continuation of the corporation on the part of defendant. For such purposes the [corporation] still stands,' " but " '[t]he law of this state is that the separate corporate entity will not be honored where to do so would be to defeat the rights and equities of third persons.' [Citations.]" (*Mesler, supra,* 39 Cal.3d at pp. 300-301.) The same is true here.

## DISPOSITION

The order is affirmed. Defendants shall recover their costs on appeal.

GRIMES, J.

We concur:

RUBIN, Acting P. J.

FLIER, J.

28