Filed 4/12/16  Haynes v. Kim CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CHRIS HAYNES II, an Incompetent Person, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CHARLES KIM, <br><br> Defendant and Appellant; <br><br> U.S. METRO GROUP, INC., <br> . <br> Defendant and Respondent. | B256817 <br><br> (Los Angeles County <br> Super. Ct. No. PC051411) |

APPEALS from a judgment of the Superior Court for the County of Los Angeles. Joseph DiLoreto, Judge.  Affirmed.

Law Offices of Michael J. Piuze, Michael J. Piuze, Geraldine Weiss; Esner Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Demler, Armstrong & Rowland, Robert W. Armstrong, Katherine C. Sample; Greines, Martin, Stein & Richland, Robert A. Olson and David E. Hackett for Defendant and Appellant.

Horvitz & Levy, S. Thomas Todd, H. Thomas Watson; Friedenthal, Heffernan & Klein, Daniel R. Friedenthal, Jay D. Brown, Kevin N. Heffernan; Kronenberg Law and William S. Kronenberg for Defendant and Respondent.

_____

## SUMMARY

Plaintiff Chris Haynes II suffered catastrophic brain injuries in a March 2011 collision between his motorcycle and a car driven by Grace Pak. By and through his guardian ad litem, plaintiff sued Ms. Pak and her father Timothy Pak, who owned the car Ms. Pak was driving. Plaintiff also sued two other defendants – Charles Kim and U.S. Metro Group, Inc. (U.S. Metro), a corporation wholly owned by Charles Kim. When the collision happened, Ms. Pak was driving her young cousin, Brandon Kim, home from school. Brandon is the son of defendant Charles Kim. Plaintiff alleged Ms. Pak was acting within the course and scope of an agency relationship with Charles Kim and U.S. Metro.

In a special verdict, the jury found Grace Pak 90 percent responsible for the harm to plaintiff, and found his damages totaled $18,572,941.77. The jury also found that Timothy Pak was an agent or sub-agent of Charles Kim and of U.S. Metro, and that Grace Pak was an agent or sub-agent of Timothy Pak and of Charles Kim, but not of U.S. Metro. Judgment was entered for plaintiff against Grace Pak, Timothy Pak and Charles Kim, but plaintiff recovered nothing from U.S. Metro. Both plaintiff and defendant Charles Kim appeal.

Defendant Kim contends there was, as a matter of law, only a familial relationship, not an agency relationship, between him and Timothy and Grace Pak. He argues that even if there was an agency relationship between Mr. Kim and Timothy Pak, there was no evidence Timothy Pak validly appointed Grace Pak as a sub-agent. In the alternative, he contends that, if anything, the Paks were independent contractors.

Plaintiff contends the jury's findings on the agency relationship between Timothy Pak and U.S. Metro necessarily meant that Grace Pak was also the sub-agent of U.S.

2

Metro, and the jury's finding to the contrary should be disregarded as surplusage. In the alternative, plaintiff contends the verdict is inconsistent and a new trial is required as to U.S. Metro's liability. Plaintiff also contends the trial court erred in rejecting his claim that U.S. Metro is liable as the alter ego of Charles Kim.

We find no merit in any of these contentions, and affirm the judgment in its entirety.

## FACTS

There is no dispute over Grace Pak's negligence or the liability of both Grace Pak and Timothy Pak, who are not parties to this appeal. The only issues involve the vicarious liability of Charles Kim and U.S. Metro for Grace Pak's negligence.

1.      **The Parties and Their Relationships**

Defendant Charles Kim is the sole shareholder of defendant U.S. Metro, a successful company in the business of providing janitorial services. For many years, he had a relationship and lived with Jenny Pak, who was the chief financial officer of U.S. Metro. Charles Kim and Jenny Pak had a son, Brandon, who was five years old at the time of the accident.

Defendant Timothy Pak was Jenny Pak's brother. Until sometime in 2008, Timothy Pak also had a janitorial business. Timothy Pak is married to Jung Hee Pak, and defendant Grace Pak is their adult daughter.

In 2008, Timothy Pak's business was failing, and the lender foreclosed on the home he and his wife owned. Timothy Pak asked his sister Jenny if his family could live with Jenny and Charles Kim, who resided in a spacious five-bedroom home in Granada Hills owned by Charles Kim, and Jenny Pak agreed. Timothy Pak and his wife moved into the Granada Hills home in spring 2008. Later in the year, Grace Pak moved there as well. After she graduated from Sarah Lawrence College in 2009, Grace Pak returned to Los Angeles and could not find a job, so she continued to live in Charles Kim's home.

Jenny Pak became seriously ill in 2008 and died in April 2009. After her death, the Pak family continued living in the Kim home with Charles Kim and Brandon (and did so until almost a year after the accident).

3

During the Paks' stay in the Kim home, Charles Kim worked very long hours, six or seven days a week, at U.S. Metro. Timothy Pak drove Brandon to and from school every day, and also did some chores around the property. Timothy Pak's wife, Jung Hee Pak, took care of Brandon, did the grocery shopping and cooking for everyone, and also did some of the cleaning. Evelyn Kim (Charles Kim's adult daughter), who also lived in the Kim home from 2009 to 2011, testified that Timothy and Jung Hee Pak loved Brandon and "were no other than a second set of parents for [Brandon]." Jung Hee Pak and Charles Kim did not get along well, and disagreed on many things.

If Timothy Pak was not available to drive Brandon to or from school, Grace Pak did so, once or twice a month. Timothy Pak considered it his responsibility either to pick up Brandon personally or to get someone to do it when he was not available. He owned two cars, and both of them were equipped with child safety seats for Brandon. Timothy Pak and Grace Pak were listed by Brandon's school as authorized to pick him up, as were Evelyn Kim and Jung Hee Pak.

The Pak family did not pay rent to Charles Kim. The rent for a similar amount of space and shared amenities in the same neighborhood would have been approximately $2,400 per month.

For much of the time the Pak family lived in the Kim home, Jung Hee Pak used a U.S. Metro corporate credit card, issued in her name, to pay for approximately $1,000 to $1,200 per month or more in food, entertainment, gas and other expenses. (Grace Pak testified, when asked who provided groceries and food for her parents, that "there was a stipend that Charles [Kim] provided for," "about $1,000, a credit card.")

U.S. Metro deducted all the credit card charges by Jung Hee Pak as business expenses. There was testimony from an account manager at U.S. Metro that, to her knowledge, no one had a U.S. Metro corporate card except its employees.

2. **The Accident, the Lawsuit and the Verdict**

On March 16, 2011, Timothy Pak drove Brandon to school, and then drove downtown to attend a proceeding related to his company's bankruptcy. He found that he would be unable to return on time to pick up Brandon from school, so he called his wife

4

and told her that "she should handle it." His wife, who did not like to drive, said she would take care of it. Mr. Pak did not know at the time whether his daughter was at home that day, but he expected that if both his wife and daughter were at home, his daughter would pick up Brandon. The accident occurred when Grace Pak turned left in front of a motorcycle driven by plaintiff, who entered the intersection on a yellow light.

At trial in the ensuing lawsuit, the court instructed the jury on general agency principles, as noted in the margin.[1] The court told the jury that if plaintiff proved Timothy Pak gave Grace Pak authority to act on his behalf, then Grace Pak was Timothy Pak's agent and/or sub-agent. With respect to plaintiff's claim that Grace Pak was also Charles Kim's agent or sub-agent, the court instructed the jury, in pertinent part:

"[Plaintiff] also claims that Grace Pak was Charles Kim's agent and/or subagent and that Charles [Kim] is therefore responsible for Grace Pak's conduct. If [plaintiff] proves that Charles Kim gave Timothy Pak or Grace Pak authority to act on his behalf, then Grace Pak was Charles Kim's agent and/or subagent. This authority may be shown by words or may be implied by the parties' conduct. This authority cannot be shown by words of Grace Pak alone."

As to U.S. Metro, the court instructed:

"[Plaintiff] also claims that Grace Pak was U.S. Metro's agent and/or subagent and that U.S. Metro Inc. is therefore responsible for Grace Pak's conduct. If [plaintiff] proves that U.S. Metro gave Charles Kim and Timothy Pak and Grace Pak authority to act on its behalf, then Grace Pak was U.S. Metro's agent – U.S. Metro Group's agent and/or

---

**1** "The corporation is responsible for harm caused by the reasonable conduct of its employees while acting within the scope of their employment. An agent is a person who at a given time is authorized to act for or in place of another person [who] is called a principal. One may be an agent although no payment for service is received. [¶] A subagent lawfully appointed represents the principal in a like manner as the original agent. . . . [¶] It is not necessary that the conduct of the agent be expressly authorized by the principal or be undertaken for the benefit of the principal for the conduct to be within the scope of the agent's authority. [¶] Conduct which is incidental to, customarily connected with, or reasonable and necessary for the performance of the authorized act is within the scope of the agent's authority."

subagent. This authority may be shown by words or may be implied by the parties' conduct. This authority cannot be shown by words of Grace Pak alone. [¶] U.S. Metro is a corporation. A corporation can act only through its officer and employee. An act or omission of an officer or employee within the scope of his authority or employment is, in the law, the act or omission of such corporation."

On March 14, 2014, the jury rendered a special verdict, after which the jury was polled on each question. The jury found both Grace Pak and plaintiff were negligent, and assigned 90 percent responsibility to Grace Pak and 10 percent to plaintiff. In addition, the jury found that: (1) Timothy Pak was an agent or sub-agent of Charles Kim and U.S. Metro on the date of the accident; (2) Grace Pak was an agent or sub-agent of Timothy Pak and Charles Kim at the time of the accident; and (3) Grace Pak was not an agent or sub-agent of U.S. Metro at the time of the accident.

Counsel for the parties raised no objections to the verdict or to the discharge of the jury.

On March 24, 2014, the court held a hearing on plaintiff's claim that U.S. Metro was the alter ego of Charles Kim. The court denied plaintiff's claim, ruling the case was governed by *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1512-1513 (*Postal Instant Press*) (rejecting "third party or 'outside' reverse piercing of the corporate veil," and holding "a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability"). The court also ruled there was no need to exercise equitable jurisdiction "because there's an adequate remedy of law, and that adequate remedy of law is that you can attach the assets of the one and only shareholder." The court further noted the existence of other remedies (fraudulent transfer, injunction, appointment of a receiver), observing "[t]here's a zillion ways to enforce this judgment against him."

Also on March 24, 2014, plaintiff filed a "brief re inconsistent verdict," arguing that judgment should be entered against U.S. Metro, because the jury's findings that Grace Pak was Timothy Pak's agent, and that Timothy Pak was U.S. Metro's agent, meant that Grace Pak was U.S. Metro's agent as a matter of law. Plaintiff also contended

6

that if the trial court concluded the inconsistent verdict could not be harmonized, a mistrial should be declared.

After briefing and a hearing, the court ruled the jury was asked to make a specific finding, and the court was not prepared to disregard it: "All the attorneys approved it. There's no question about that. Is it an invited error, I don't know, maybe it is or maybe it isn't; but, notwithstanding that, they were asked to make a specific finding and they did. And at this point I'm not prepared to disregard the finding . . . ."

Accordingly, the court entered judgment ordering that plaintiff recover $16,715,647.59 from defendants Grace Pak, Timothy Pak and Charles Kim, and recover nothing from U.S. Metro.

### 3.    Postjudgment Proceedings

After judgment was entered, Charles Kim filed motions for judgment notwithstanding the verdict and for a new trial. Defendant Kim argued that the overwhelming weight of the evidence was contrary to the jury finding on the agency issue, and the jury would likely have reached a different result "had they been properly instructed as to the law of agency via the special instructions which were proposed by the defendant and rejected by the trial court."[2]  The trial court denied both motions, saying this:

"[W]hen you analyze the evidence in this case, I think it's clear that what the Paks were doing for the Kims was really not out of the goodness of their heart because [these] people didn't particularly like each other. So if they didn't particularly like each other, why [were] the Paks picking up Mr. Kim's child?

"Well, I think the answer is obvious, and I think that was obvious to the jury. The reason they're doing it . . . is they're getting compensation for it. He's letting them live in his house and he's giving them pretty much a carte blanche use of some credit cards in

---

[2]    These special instructions included, for example, that "[i]n the absence of the essential characteristic of the right of control, there is no true agency," and "[t]he primary test for determining whether a person performing gratuitous services for another does so as the latter's agent is whether or not the alleged principal controlled or had the legal right to control the activities of the alleged agent."

7

this case. [¶] . . . [¶] . . . I think it was reasonable for the jury to conclude that there was consideration given for the fact that Mr. Kim, because of the way he worked -- . . . that he was a quintessential workaholic, and he spent every hour of his daylight time . . . thinking about his business . . . .

"So I think in this case, first, that there is a factual basis based upon the conduct of the parties and the continued conduct of the parties. This wasn't a case where they're taking the child to school once a week or once a month or when one of parents gets sick or somebody is out of town. This was a pattern of conduct which the parties acknowledge, 'That was my job.' [¶] . . . [¶]

"So when you look at . . . the totality of the evidence . . . , I think that the acts weren't gratuitous. I think they're not analogous into a family situation. I think there was consideration for doing it. I think the parties expected each other to perform certain duties. Picking up and taking a child to school really doesn't require a lot of exercise of authority or direction. I mean, 'take my kid and bring him to school. Make sure he gets home safely.' So I'm not concerned about that, about, you know, telling him exactly what to do and how to do it, et cetera.

"So this was more than just doing a favor for a relative. Certainly it was. And I think, under the circumstances of this case, that there is certainly sufficient evidence for the jury to determine that the agency existed, and that's exactly what they did over five days of deliberation."

Plaintiff appealed from the judgment in favor of U.S. Metro, and defendant Kim appealed from the judgment and the orders denying his motions for judgment notwithstanding the verdict and for a new trial.

**DISCUSSION**

1. **Defendant Kim's Appeal**

Defendant Kim's principal contention is that there cannot be an agency relationship between him and Grace Pak as a matter of law. Specifically, he asserts that "[h]ousehold errand-running family members and co-habitants are not 'agents' and their negligence cannot be imputed to their relatives or others living in their households." For

8

this proposition, Mr. Kim relies on *Edwards v. Freeman* (1949) 34 Cal.2d 589 (*Edwards*). *Edwards*, we are told, "leaves no doubt that when family members help each other by running errands, without any evidence of an employment relationship, and without any evidence showing a right to control, there is no basis for imputing negligence between them." We disagree with Mr. Kim's contention, and with the conclusions he draws from *Edwards*.

In *Edwards*, the plaintiff asked her son to take her along with him the next time he was driving into town, so that she could get her eyes tested. The son agreed to do so on the following day, when he had an errand in town. The plaintiff was injured in a collision between the son's automobile and a pickup truck that occurred on their way to town. The Supreme Court held the son's negligence could not be imputed to the mother to bar her recovery in her lawsuit against the other driver. (*Edwards, supra,* 34 Cal.2d at pp. 591-592.)

Mr. Kim is correct that *Edwards* held, "where the evidence shows no more than a friendly or filial service, gratuitously rendered, it was error to submit the issue of imputed negligence to the jury . . . ." (*Edwards, supra,* 34 Cal.2d at p. 594.) This, however, is not such a case, because there was substantial evidence (related above) from which the jury here could find that the service rendered by Timothy Pak to Charles Kim was *not* "a friendly or filial service, gratuitously rendered . . . ." (*Ibid.*) As we have seen, the trial judge's view of the evidence was the same as the jury's: this was "more than just doing a favor for a relative" and "the acts weren't gratuitous"; "there was consideration for doing it."

We are aware of no authority for the proposition that a family member who performs services for another family member, and receives compensation for doing so, cannot be an agent. None of the cases Mr. Kim cites suggests as much, and the law is to the contrary. The rule is stated in *Harpst v. Kirkpatrick* (1972) 26 Cal.App.3d 482, 486: "While *a member of a family may be an agent of another member of the family*, for purposes of imputing negligence the mere gratuitous performance of familial services by

9

one for the other does not convert the family activity into a joint enterprise [citation] or establish a principal and agency relationship between them [citation]." (Italics added.)

All the cases Mr. Kim cites involve gratuitous acts of friends, colleagues or family members. (See, e.g., *Flores v. Brown* (1952) 39 Cal.2d 622, 628 [the negligence of a defendant who was towing a business associate's trailer for the associate's benefit "may be imputed to [the associate] only if [the defendant] was acting as his agent or employee"; if the defendant was hauling the trailer "as a mere favor" to his associate, or as an independent contractor, "negligence may not be imputed"]; *Harpst v. Kirkpatrick, supra,* 26 Cal.App.3d at pp. 484, 486 [grandmother's negligence in caring for child was not imputable to mother and did not bar mother's recovery for death of child struck by the defendant's automobile; "the evidence merely showed that [the grandmother] was gratuitously rendering a familial service in caring for her granddaughter on the date of the accident"]; *Stoddard v. Fiske* (1917) 35 Cal.App. 607, 609 [driver who had an accident while on an errand to assist a friend was not the friend's agent; "it is clear that the [driver] undertook what he did in order to be of assistance to [his friend] in his difficulty and as an act of friendship from one man to another"; the doctrine of respondeat superior "must necessarily be based upon a relationship between two parties by which one has the legal right to direct the activities of the other and the latter the legal duty to submit to such direction"].)

Mr. Kim reads the word "gratuitous" out of the governing principles, and ignores the evidence in this case that clearly permits the inference that Timothy Pak did not act "gratuitously." Instead, Mr. Kim points to the Supreme Court's statement in *Edwards*, that "to permit a finding of agency upon this evidence would be, in effect, to hold that one who performs a mere favor for another, without being subject to any legal duty of service and without assenting to any right of control, can be an agent," and "[t]his is not the law." (*Edwards, supra,* 34 Cal.2d at pp. 591-592.) According to Mr. Kim, there was "no evidence that [he] exercised control over the manner in which Grace was driving" or that "he had the right or power to control her operation of [Timothy Pak's vehicle]," and indeed that he "had no *legal* right to tell Tim or Grace to pick up Brandon."

10

These arguments have no merit. The evidence supported the conclusion there was an agreement between Timothy Pak and Mr. Kim that Mr. Pak was responsible for driving Brandon to and from school. And there was likewise plenty of evidence that Timothy Pak did not do so "gratuitously" or "as a mere favor" or "as an act of friendship"; the evidence showed Timothy Pak and his family received economic benefits of more than $3,000 per month for several years. Similarly, the claim Mr. Kim had no control over "the manner in which Grace was driving" is a red herring. (See *Malloy v. Fong* (1951) 37 Cal.2d 356, 370 ["The power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities," and " '[t]he right to immediately discharge involves the right of control.' "].)

Mr. Kim tells us that his provision of rent-free housing and payment of Pak family expenses "makes absolutely no difference here." No legal authority supports that proposition. Mr. Kim asserts that *Planck v. Hartung* (1979) 98 Cal.App.3d 838 holds that "the sharing of household expenses, and even the repeated performance of household chores, among co-habitants does not support the imputation of negligence from one co-habitant to another." *Planck v. Hartung* did not so hold. It did not involve agency principles. It involved a claim that two unmarried people living together as a family were engaged in a joint venture – a " 'common business undertaking' " – making both of them liable for damages from a fire occasioned when one of them negligently used a barbeque device owned by the other. (98 Cal.App.3d at pp. 840, 841.) This proposition was soundly rejected, the court observing there was no business purpose or profit motive (as is required for a joint venture) in their living arrangement, other than the benefit normal and typical in all families. (*Id.* at p. 841.) Further, if they had been married, there would have been no liability imputed from one to the other, and "[a] fortiori there is none here." (*Id.* at pp. 841, 842.) *Planck v. Hartung* is not relevant to this case.

Mr. Kim also offers a six-page argument that the jury's verdict finding Grace Pak was his agent or subagent is contrary to public policy and "has no limits." We decline to consider a public policy claim that reaches beyond case authorities, has no grounding in statutory law, and is untethered to the facts before the jury in this case.

11

Next, Mr. Kim contends Grace Pak's negligence cannot be imputed to him in any event because the Paks were independent contractors. There follows a discussion of the distinctions between the employer-employee relationship (where respondeat superior doctrine applies) and the hirer-independent contractor relationship (where it ordinarily does not). (See *Flores v. Brown, supra,* 39 Cal.2d at p. 628 [defendant's negligence may be imputed to business associate only if the defendant "was acting as his agent or employee," not if the defendant was doing "a mere favor" or was acting as an independent contractor].) We find Mr. Kim's discussion irrelevant in this case, where the only question is whether an agency relationship existed. So far as the record shows, the jury was not instructed on independent contractor status, nor did Mr. Kim (or anyone else) request such an instruction. It is far too late to raise the point at this stage.

Finally, Mr. Kim argues that even if he and Timothy Pak had an agency relationship, Grace Pak could not have been his subagent as a matter of law. He points to Civil Code section 2349, which provides that an agent can delegate his powers to another person in four cases, "and in no others." (Civ. Code, § 2349.) Those four circumstances are "[w]hen the act to be done is purely mechanical;" or "[w]hen it is such as the agent cannot himself, and the subagent can lawfully perform;" or "[w]hen it is the usage of the place to delegate such powers;" or "[w]hen such delegation is specially authorized by the principal." (*Id.*, subds. 1-4.) According to Mr. Kim, there was no evidence any of these circumstances existed. Once again, we reject Mr. Kim's analysis.

We begin by noting that the initial instructions to the jury on subagents was simply this: "A subagent lawfully appointed represents the principal in a like manner as the original agent." Mr. Kim did not object to this instruction. Nor did he argue to the jury that Timothy Pak could not lawfully delegate his authority to Grace Pak – he merely argued that Timothy Pak was not his agent and this was just a case of "[f]amily . . . helping family."

During deliberations, however, the jury submitted a question: "Please define and explain the meaning of 'lawfully appointed' and the jury instructions regarding sub-agent." The trial court announced its intention to read directly from Civil Code

12

section 2349, and to give the jury hard copies as a special jury instruction.[3]  There was no objection by any party.

Now, Mr. Kim insists there was "no evidence" that driving Brandon home from school was "purely mechanical," or that it was "the usage of the place" to delegate his driving duties, or that Charles Kim "specially authorized" Timothy Pak to delegate the driving to Grace Pak, and he claims that Timothy Pak was not "legally compelled" to remain at the bankruptcy court proceedings.  But none of the statutory terms was further defined for the jury, and Mr. Kim did not request any further elaboration.  The jury may well have concluded that driving was "purely mechanical" (and the authorities Mr. Kim cites for his claim that driving involves "judgment and discretion" do not involve driving).  Similarly, Mr. Kim merely asserts, without citation of authority, that he did not "specially authorize[]" any delegation of Timothy Pak's driving duties to Grace Pak.  But the jury could surely infer that Charles Kim in fact approved the delegation to Grace Pak, since her name appeared on school forms listing persons authorized to pick up his son at school.  Further, Mr. Kim cites no authority for his interpretation of Civil Code section 2349, subdivision 2 (which he says requires evidence that Timothy Pak was "legally compelled" to remain at the bankruptcy court on the day of the accident, in order to satisfy the requirement that he "cannot himself, and the subagent can lawfully perform" the driving he delegated that day).

In short, we see no basis for ignoring the jury's special verdict that Grace Pak was "an agent or sub-agent" of Timothy Pak and Charles Kim.[4]

---

**3**  Also included in the answer to the jury's question were Civil Code sections 2350 and 2351.  Section 2350 states that "[if] an agent employs a subagent without authority, the former is a principal and the latter his agent, and the principal of the former has no connection with the latter."  Section 2351 provides that "[a] sub-agent, lawfully appointed, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the sub-agent."

**4**  Defendant Kim also contends, in a "contingent and protective" respondent's brief in plaintiff's appeal, that the verdict was inconsistent and that a new trial is required as to

13

## 2. Plaintiff's Appeal

### a. The special verdict

Plaintiff contends judgment should have been entered against U.S. Metro, despite the jury's finding that Grace Pak was not an agent or sub-agent of U.S. Metro. In plaintiff's view, once the jury found that Timothy Pak was "an agent or sub-agent" of U.S. Metro, and that Grace Pak was "an agent or sub-agent" of Timothy Pak, those findings required the conclusion – as a matter of law – that Grace Pak was also a sub-agent of U.S. Metro. Consequently, we are asked to disregard the jury's finding to the contrary as "surplusage," and if not, to find the verdict is inconsistent, requiring a new trial. We are not persuaded.

#### i. The legal principles

"[W]e review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.) A special verdict is deemed inconsistent when it is " 'beyond possibility of reconciliation under any possible application of the evidence and instructions.' [Citation.]" (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716.) " 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.' [Citations.]" (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682.) "The proper remedy for an inconsistent special verdict is a new trial." (*Singh, supra,* at p. 358.)

A party who fails to object to a special verdict before the jury is discharged may forfeit his claim that the special verdict is defective. (E.g., *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242-1243 ["Because appellant did not object and had expressly approved the erroneous verdict form, it forfeited its claim that the special verdict is defective because the jury did not answer [two] questions."].) Waiver

---

all parties. We discuss and reject the inconsistency claim in connection with plaintiff's contentions concerning the verdict in favor of U.S. Metro.

14

(forfeiture) is not automatic and there are exceptions to this rule. (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456, fn. 2; see *ibid.* ["[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy' "; "waiver is not an issue where a defect is latent and there is no hint of 'litigious strategy' "].) But as the Supreme Court explained in *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, " 'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.' [Citation.]" (*Id.* at pp. 263-264, italics omitted; see *id.* at p. 270 ["*Woodcock*'s articulated exception to the waiver (forfeiture) rule for *ambiguous* verdicts" did not apply to incomplete polling of a juror].)

### ii.  This case

Plaintiff at no point objected to the special verdict form, which asked the jury to make separate findings as to Timothy Pak and Grace Pak. All the parties agreed on the special verdict form. Nor did plaintiff raise any objection to the special verdict after it was read in open court and the jury was polled on each question. Nor was this a case where there was any latent defect in the verdict. On the contrary, the answers plaintiff now asserts are inconsistent – that Timothy Pak was an agent or subagent of U.S. Metro, and Grace Pak was not – were perfectly plain when the verdict was rendered. Under these circumstances, we conclude the rule stated in *Keener* applies: here, plaintiff failed to object and request clarification or further deliberation on the jury's answers, even though the now-claimed inconsistency was apparent. (*Keener, supra,* 46 Cal.4th at pp. 263-264; see *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [the defendant "waived any objection to the special verdict form by failing to object before the court discharged the jury"]; but see *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1093, fn. 6 ["inconsistent jury findings in a special verdict are not subject to waiver by a party"].)

15

Plaintiff attempts to avoid this result by claiming he "is not contending that the special verdict form is erroneous," but only that the jury's other answers made its finding that Grace Pak was not U.S. Metro's agent or subagent "surplusage" that we may disregard, and alternatively that it is inconsistent. But of course we cannot disregard a jury's finding on a factual matter it was specifically asked to determine. The cases plaintiff cites to support his contention that we should disregard the jury's finding as "surplusage" are uniformly inapt. (See, e.g., *Dauenhauer v. Sullivan* (1963) 215 Cal.App.2d 231, 234-235 [a verdict awarding plaintiffs damages of $37,000 "was in itself sufficient to constitute a complete verdict, and the additional language apportioning damages among the several defendants was mere surplusage which could be disregarded by the trial court at the time of entry of judgment"; independent tortfeasors were jointly and severally liable where their acts united in causing one single and indivisible result].)

In short, the claim of "surplusage" is meritless, and we find defendant forfeited the claim that the jury's findings were inconsistent. But in any case, the inconsistency claim fails on the merits.

The question of agency is a finding of fact. The jury was *not* instructed that, if it found Timothy Pak was U.S. Metro's agent or subagent, then it must also find that Grace Pak, too, was U.S. Metro's agent or subagent. No party ever requested any such instruction. The jury was instructed that Timothy Pak was responsible, and Grace Pak was his agent or subagent, if plaintiff proved "that Timothy Pak gave Grace Pak authority to act on his behalf . . . ." Clearly he did. Similarly, the jury was instructed that Charles Kim was responsible, and Grace Pak was his agent or sub-agent, if plaintiff proved "that Charles Kim gave Timothy Pak *or* Grace Pak authority to act on his behalf . . . ." (Italics added.) Again, clearly there was evidence that Charles Kim gave Timothy Pak that authority, and that was enough to make Charles Kim responsible for Grace Pak's conduct.

The evidence, however, showed no direct link of any kind between U.S. Metro (i.e., Charles Kim in his capacity as CEO of U.S. Metro) and Grace Pak. (Plaintiff asserts there was "ample evidence" of a connection between U.S. Metro and Grace Pak, but the

16

only evidence is "through Tim Pak." And that evidence consists only of the fact that Timothy Pak's wife – not Grace Pak – used a U.S. Metro credit card to pay for household expenses.) Thus, from the instructions and the evidence (more precisely, the lack of evidence), the jury was certainly justified in concluding that, whatever may have been the relationship between U.S. Metro and Timothy Pak, U.S. Metro did not give Grace Pak any authority to act on its behalf in transporting Brandon.

Plaintiff insists that if Timothy Pak was U.S. Metro's agent or sub-agent, then Grace Pak was also, as a matter of law, simply because she was Timothy Pak's agent or sub-agent. In other words, the claim is that if one person (Grace Pak) is the agent of another person (Timothy Pak) who has two principals (U.S. Metro and Charles Kim individually), then she is necessarily also the agent of *both* of the other person's (Timothy Pak's) principals. We see no reason why that is necessarily so. The jury could have found that Timothy Pak was authorized to act for both U.S. Metro and Charles Kim on the date of the accident (as it did), but that when he authorized Grace Pak to pick up Brandon, Timothy Pak was in fact acting only for Charles Kim in his individual capacity. That is a common-sense view of the facts presented to the jury. As already noted, the connection between U.S. Metro and Timothy Pak was the compensation provided by virtue of the U.S. Metro credit card used by Timothy Pak's wife. The jury may well have concluded that this was too tenuous a connection to extend to Grace Pak, and that Timothy Pak was acting only for Charles Kim individually when he authorized Grace Pak to pick up Brandon.

Further, plaintiff cites no legal authority for the proposition that an agent with two principals (Timothy Pak) must be acting for both of them when he appoints a sub-agent (Grace Pak). Plaintiff merely states, without citation of authority, that the jury found Timothy Pak vicariously liable for Grace Pak's tortious conduct, and "[i]n turn, US Metro, Inc., as Timothy Pak's principal, was vicariously liable for *his* tortious conduct." (Italics added.) This statement itself is incorrect, because Timothy Pak engaged in no tortious conduct; he was only liable vicariously for Grace Pak's conduct. And if plaintiff means to say that U.S. Metro, as Timothy Pak's principal, was vicariously liable for

17

*Grace Pak*'s tortious conduct, plaintiff is merely stating the result he wants to reach. The jury found otherwise, and the instructions and evidence permitted the jury so to find.

In sum, there is no merit to plaintiff's claim that the special verdict was inconsistent in any of its findings.

### b.    The alter ego issue

Plaintiff also contends the trial court erred when it rejected his claim that U.S. Metro should be liable for the judgment against Mr. Kim in any event, because U.S. Metro is Mr. Kim's alter ego. The trial court followed the principle stated in *Postal Instant Press*, where the court held that "a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability." (*Postal Instant Press, supra,* 162 Cal.App.4th at p. 1513 [rejecting "third party or 'outside' reverse piercing of the corporate veil"].) We find no error in the trial court's ruling.

This case does not require us to depart from the sound reasoning in *Postal Instant Press*. The opinion includes a thorough analysis of cases from California, federal and other state courts discussing "outside reverse piercing of the corporate veil," both cases accepting, and others rejecting that theory of alter ego. The *Postal Instant Press* opinion rejected it as "a radical and problematic change in standard alter ego law." (*Postal Instant Press, supra*, 162 Cal.App.4th at p. 1521.)

It would be inappropriate to apply the doctrine of outside reverse piercing in this case. The fundamental rule for disregarding the corporate entity, whether based on "outside reverse piercing" or otherwise, has two essential requirements. The first, emphasized by plaintiff, is " 'such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist . . . .' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.) The second requirement is that " 'the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.' [Citation.]" (*Wood v. Elling Corp.* (1977) 20 Cal.3d 353, 365, fn. 9 (*Wood*).)

18

Here, the trial court properly concluded this was not a case for the exercise of equitable power to pierce the corporate veil, because there are adequate legal remedies: attachment of Mr. Kim's assets (he is the sole shareholder of U.S. Metro); fraudulent transfer claims (if Mr. Kim were to transfer personal assets into the corporation); injunction; receivership; and so on. The trial court's conclusion is supported by *Postal Instant Press*, where the plaintiff failed to pursue available legal remedies. It is also supported by traditional alter ego cases, where the Supreme Court permits us to disregard the corporate form only "when the ends of justice so require . . . ." (*Mesler v. Bragg Management Co., supra,* 39 Cal.3d at p. 301.)

On appeal, plaintiff ignores these authorities and the principles they enunciate, and expressly disclaims any contention that Mr. Kim has transferred assets to U.S. Metro to avoid liability to plaintiff. Instead, plaintiff claims "that due to the manner in which Mr. Kim operated US Metro[,] that corporation has no identity separate and apart from Mr. Kim and that this provides another independent basis to conclude that US Metro is responsible for the tortious conduct of the Paks." As we have seen, that plainly is not the law.

In short, the law requires *both* a lack of separate identity *and* an inequitable result before we may disregard the corporate form. Plaintiff has not shown, or even articulated a theory for showing, that " 'adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.' " (*Wood, supra,* 20 Cal.3d at p. 365, fn. 9.) The trial court did not err in refusing to recognize plaintiff's alter ego claim.

## DISPOSITION

The judgment is affirmed. U.S. Metro Group, Inc., shall recover its costs on appeal. Plaintiff shall recover costs incurred in responding to Mr. Kim's appeal.


GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.                    FLIER, J.

19